UNITED STATES *v.* ARMOUR & CO. ET AL.

No. 759.   Argued April 19, 1971—Decided June 1, 1971

MARSHALL, J., delivered the opinion of the Court, in which BURGER, C. J., and HARLAN and STEWART, JJ., joined. DOUGLAS, J., filed a dissenting opinion, in which BRENNAN and WHITE, JJ., joined, *post,* p. 683. BLACK and BLACKMUN, JJ., took no part in the consideration or decision of this case.

*Deputy Solicitor General Springer* argued the cause for the United States. With him on the brief were *Solicitor General Griswold, Deputy Assistant Attorney General Comegys,* and *Howard E. Shapiro.*

*Edward L. Foote* argued the cause for appellee Greyhound Corp. With him on the brief was *Robert J. Bernard.*

MR. JUSTICE MARSHALL delivered the opinion of the Court.

Here as in *United States* v. *Armour & Co.,* 398 U. S. 268, we have been asked to determine if the Meat Packers Consent Decree of 1920, which prohibits Armour & Co. from dealing directly or indirectly in certain specified commodities, prohibits a corporation that may deal in some of those specified commodities from acquiring a controlling interest in Armour. When this decree was

here last Term the Government was seeking to prevent General Host, a company engaged in the manufacture and sale of a variety of food products, from acquiring control of Armour. While that case was pending, General Host agreed to sell its interest in Armour to Greyhound Corp., a regulated motor carrier. After the required approval was obtained from the Interstate Commerce Commission, the transaction was consummated. This Court then dismissed the action against General Host as moot. 398 U. S. 268.

The Government then proceeded against Greyhound as it had against General Host and filed a petition in the District Court alleging that Greyhound's engagement in businesses[1] forbidden to Armour or any firm in which Armour has a direct or indirect interest, and that Greyhound's ownership of Armour create a relationship forbidden by the 1920 Consent Decree. The District Court, as it had when General Host's ownership of Armour was at issue, held that the Consent Decree did not prohibit such acquisitions. The Government appealed.

This case does not involve the question whether the acquisition of a majority of Armour stock by Greyhound is illegal under the antitrust laws. If the Government had wished to test that proposition, it could have brought an action to enjoin the acquisition under § 7 of the Clayton Act, 38 Stat. 731, as amended, 15 U. S. C. § 18. Alternatively, if the Government believed that changed conditions warranted further relief against the acquisition, it could have sought modification of the

---

[1] The Government claims that two of Greyhound's wholly owned subsidiaries are engaged in the retail food business. Prophet Foods Co., an industrial catering company, operates eating facilities in industrial plants, schools, hospitals, nursing homes, and other commercial establishments. In 1968 Prophet's sales were in excess of $77 million. Post Houses, Inc., operates restaurants in bus stations and at rest and meal stop locations. Post Houses had sales in excess of $33 million in 1968.

Meat Packers Decree itself.[2] It took neither of those steps, but, rather, sought to enjoin the acquisition under the decree as originally written. Thus the case presents only the narrow question whether ownership of a majority of stock in Armour by a company that engages in business forbidden to Armour by the decree, in itself and without any evidentiary showing as to the consequences, violates the prohibition against Armour's "directly or indirectly . . . engaging in or carrying on" that forbidden business.

On February 27, 1920, the United States filed a bill in equity against the Nation's five largest meatpackers, including Armour, and against their subsidiary corporations and controlling stockholders, charging conspiratorial and individual attempts to monopolize a substantial part of the Nation's food supply. The bill alleged that the packers, from their initial position of power in the slaughtering and packing business, had acquired control of the Nation's stockyards, stockyard terminal rail lines, refrigerated rolling stock, and cold storage facilities, and that they had used predatory practices to eliminate competition in the food business.

The bill further alleged that the packers, having gained monopoly power in the meat business, were attempting to destroy competition in products which might be substituted for meat. That objective was being pursued through the acquisition of nonmeat food companies and by means of exclusive output contracts with suppliers. The prayer for relief sought, along with other prohibitions against the defendants' attempts to monopolize, the divestiture of most of their nonpacking operations and the permanent exclusion of them from the substitute food business.

---

[2] See *Chrysler Corp.* v. *United States,* 316 U. S. 556 (1942); and see generally Note, Flexibility and Finality in Antitrust Consent Decrees, 80 Harv. L. Rev. 1303 (1967).

On the same day as the complaint was filed, defendants filed their answer, denying its essential allegations, and both sides filed a stipulation to a consent decree, granting the Government the largest part of the relief it had sought. Paragraph Fourth of the decree enjoined the corporate defendants, including Armour, from "either directly or indirectly, by themselves or through their officers, directors, agents, or servants, engaging in or carrying on, either by concert of action or otherwise . . . the manufacturing, jobbing, selling . . . distributing, or otherwise dealing in" a long list of food and other products sold by grocery stores. Paragraph Fourth further enjoined the corporate defendants from "owning, either directly or indirectly . . . any capital stock or other interests whatsoever" in any business which dealt in these commodities.[3]

Paragraph Eighteenth of the decree provided that the court should retain jurisdiction of the case "for the purpose of taking such other action or adding to the foot of this decree such other relief, if any, as may become necessary or appropriate for the carrying out and enforcement of this decree."

Since 1920, the decree has withstood a motion to vacate it in its entirety, *Swift & Co.* v. *United States,* 276 U. S. 311 (1928), and two attempts on the part of the defendants to have it modified in light of alleged changed circumstances. *United States* v. *Swift & Co.,* 286 U. S. 106 (1932); *United States* v. *Swift & Co.,* 189 F. Supp. 885, 892 (ND Ill. 1960), aff'd, 367 U. S. 909 (1961). Thus the decree stood at the time this case arose, and still stands, as originally written.

The Government does not contend that Greyhound's acquisition of controlling interest in Armour subjects

---

[3] Paragraph Eighth made identical provisions with respect to certain dairy commodities.

Greyhound to punishment for contempt since it was not a party to the decree. Nor does the Government contend that Greyhound has acted "in active concert or participation with" a party.[4]  Instead, the Government argues that Greyhound should have been brought before the District Court, which retained permanent jurisdiction over the decree, pursuant to § 5 [5] of the Sherman Act, and be enjoined from acting to exercise control over or influence the business affairs of Armour, and be required to divest itself of the Armour stock.

The contention is that the acquisition violates the decree since it causes Armour to be engaged in activities prohibited by the decree.  The claim is that Greyhound is engaged in businesses that the decree prohibits Armour from being engaged in and the decree's purported purpose of separating the meatpackers from the retail food business is thus circumvented.

But while structural separation of this kind may have been the Government's overall aim, the decree itself, carefully worked out between the parties in exchange for their right to litigate the issues, does not effect a complete separation, but, rather, prohibits particular actions

---

[4] Fed. Rule Civ. Proc. 65 (d) provides:

"Every order granting an injunction . . . is binding only upon the parties to the action, their officers, agents, servants, employees, and attorneys, and upon those persons in active concert or participation with them who receive actual notice of the order by personal service or otherwise."

[5] Section 5 of the Sherman Act, 26 Stat. 210, 15 U. S. C. § 5, provides:

"Whenever it shall appear to the court before which any proceeding under section 4 of this title may be pending, that the ends of justice require that other parties should be brought before the court, the court may cause them to be summoned, whether they reside in the district in which the court is held or not; and subpoenas to that end may be served in any district by the marshal thereof."

and relationships not including the one here in question. The crucial provision, Paragraph Fourth, forbids the corporate defendants from "engaging in or carrying on" commerce in the enumerated product lines. This language, taken in its natural sense, bars only active conduct on the part of the defendants. Thus Armour could not trade in these products, either under its own corporate form, or through its "officers, directors, agents, or servants." The entry of Armour into the grocery business through subsidiaries is clearly and Draconically prevented by the separate provision of Paragraph Fourth forbidding the defendant meatpackers from owning "any . . . interests whatsoever"[6] in a firm trading in the enumerated commodities. In the Government's view these prohibitions also bar Armour from having any ownership relationship with corporations like Greyhound. The Government contends that Armour has an obligation not to engage directly or indirectly in legal or economic association with firms in the retail food business. It refers to the prohibited relationship between Armour and Greyhound.

But the decree does not speak in terms of relationships in general, but, rather, prohibits certain behavior, and in doing so prohibits some but not all economic interrelationship between Armour and the retail food business. Armour may not carry on or engage in that business, nor may it acquire any interest in any firm

---

[6] That portion of Paragraph Fourth provides:

"[T]he corporation defendants and each of them be, and they are hereby, further perpetually enjoined and restrained from owning, either directly or indirectly, severally or jointly, by themselves or through their officers, directors, agents, or servants any capital stock or other interests whatsoever in any corporation, firm, or association except common carriers, which is in the business, in the United States, of manufacturing, jobbing, selling, transporting, except as common carriers, distributing, or otherwise dealing in any of the above-described products or commodities."

in that business, but there is no prohibition against selling any interest to a grocery firm, or more generally against entering into an ownership relationship with such a firm.[7] If the parties had agreed to such a prohibition, they could have chosen language that would have established the sort of prohibition that the Government now seeks.

If the parties had agreed to prohibit the kind of transaction here involved, that end could also have been accomplished through the provision of the decree running against the stockholders of the defendant meatpackers. Many of the controlling stockholders were defendants in the 1920 action, and the decree prohibits certain conduct on their part in Paragraph Fifth.[8] That paragraph prohibits the individual defendants from own-

---

[7] The Government contends that Paragraph Fourth prohibits Armour from *having* "any . . . interests whatsoever" in firms engaged in the prohibited businesses and that Armour as a subsidiary of Greyhound *has* an "interest" in the other Greyhound subsidiaries that are engaged in the retail food business. But Paragraph Fourth does not prohibit Armour from *having* any interest; it prohibits Armour from "owning" an interest. See n. 6, *supra.* Clearly, Armour has nothing approaching an ownership interest in Greyhound or Greyhound's subsidiaries.

[8] Paragraph Fifth provides:

"That the individual defendants and each of them, be, and they are hereby, perpetually enjoined and restrained from, in the United States, either directly or indirectly, by themselves or through their agents, servants, or employees, owning voting stock which in the aggregate amounts to 50% or more of the voting stock of any corporation, except common carriers, or any interest in such corporation resulting in a voting power amounting to 50 per cent or more of the total voting power of such corporation, or which interest by any device gives to any such defendant or defendants a voting power of 50 per cent or more in any such corporation, or a half interest or more in any firm or association which corporation, firm, or association may be, in the United States, in the business of manufacturing, jobbing, selling, transporting, distributing, or otherwise dealing in . . . [specified products]."

ing a half interest or more in any firm engaged in the product lines enumerated in Paragraph Fourth. This prohibition, through its negative implications, refutes the Government's argument that the decree established a complete structural separation between the defendant corporations and the retail food business. For it allows a controlling stockholder of a meatpacker to own a controlling, though not a majority, interest in a grocery firm—say 49% of the common stock, a figure which in all but the most unusual corporate situation would represent *de facto* control.

Perhaps more important, the prohibitions of Paragraph Fifth run only against the named stockholders and not against their successors and assigns. If a "successors and assigns" clause had been included, the Government could argue with some persuasiveness that ownership of a meatpacker by a controlling interest in a retail food firm was prohibited. And the parties were able to use the words "successors and assigns" when they wanted to. Paragraph Third, which prohibits the corporate defendants from using their distribution facilities to handle the commodities named in Paragraph Fourth, expressly runs against the corporations and their "successors and assigns."

In short, we do not find in the decree a structural separation such as the Government claims. On the one hand, the decree leaves gaps inconsistent with so complete a separation; on the other, language that would have been apt either to create a complete separation or to bar with particularity the sort of transaction involved here was not used.

Stepping back from this analysis of the terms of the 1920 decree, we are confronted with the Government's argument that to allow Greyhound to take over Armour would allow the same kind of anticompetitive evils that the 1920 suit was brought to prevent. In its 1920 suit,

the Government sought to insulate the large meatpackers from the grocery business, both to prevent the destruction of competition in that business, and to prevent consolidation of the packers' monopoly control of the meat business by controlling commerce in products that might be substitutes for meat. Those purposes, the Government says, are frustrated as much by a retail food company's acquisition of a meatpacker as they would be by a meatpacker's entry into the retail food business.

This argument would have great force if addressed to a court that had the responsibility for formulating original relief in this case, after the factual and legal issues raised by the pleadings had been litigated. It might be a persuasive argument for modifying the original decree, after full litigation, on a claim that unforeseen circumstances now made additional relief desirable to prevent the evils aimed at by the original complaint.[9] Here, however, where we deal with the construction of an existing consent decree, such an argument is out of place.

Consent decrees are entered into by parties to a case after careful negotiation has produced agreement on their precise terms. The parties waive their right to litigate the issues involved in the case and thus save themselves the time, expense, and inevitable risk of litigation. Naturally, the agreement reached normally embodies a compromise; in exchange for the saving of cost and elimination of risk, the parties each give up something they might have won had they proceeded with the litigation. Thus the *decree* itself cannot be said to have a purpose; rather the *parties* have purposes, generally opposed to each other, and the resultant decree embodies as much of those opposing purposes as the respective parties have the bargaining power and skill

---

[9] See sources cited in n. 2, *supra*.

to achieve.[10] For these reasons, the scope of a consent decree must be discerned within its four corners, and not by reference to what might satisfy the purposes of one of the parties to it. Because the defendant has, by the decree, waived his right to litigate the issues raised, a right guaranteed to him by the Due Process Clause, the conditions upon which he has given that waiver must be respected, and the instrument must be construed as it is written, and not as it might have been written had the plaintiff established his factual claims and legal theories in litigation.

This Court has recognized these principles before. In *Hughes* v. *United States*, 342 U. S. 353 (1952), the Government sought to construe a consent decree that gave the defendant the option of selling his stock or putting it in a voting trust as requiring him to sell the stock within a reasonable time even though he chose the voting trust alternative, because the pro-competitive purpose of the decree would otherwise be frustrated. The Court responded:

"It may be true as the Government now contends that Hughes' large block of ownership in both types of companies endangers the independence of each. Evidence might show that a sale by Hughes is indispensable if competition is to be preserved. However, in section V the parties and the District Court provided their own detailed plan to neutralize the evils from such ownership. Whatever justification there may be now or hereafter for new terms that require a sale of Hughes' stock, we think there is no fair support for reading that requirement into the language of section V." 342 U. S., at 357.

In *United States* v. *Atlantic Refining Co.*, 360 U. S. 19 (1959), the Government sought an order limiting the

---

[10] Cf. Note, Flexibility and Finality, n. 2, *supra*, at 1314–1315.

dividends payable by common carriers to shipper-owners, under a consent decree that allowed such dividends to be paid according to a stated formula. Noting that the language in which the formula was expressed could "be made to support the United States' contention," but characterizing that construction as "strained," 360 U. S., at 22, the Court stated:

> "The Government contends that the interpretation it now offers would more nearly effectuate 'the basic purpose of the Elkins and Interstate Commerce Acts that carriers are to treat all shippers alike.' This may be true. But it does not warrant our substantially changing the terms of a decree to which the parties consented without any adjudication of the issues." *Id.*, at 23.

And here too, although the relief the Government seeks may be in keeping with the purposes of the antitrust laws, we do not believe that it is supported by the terms of the consent decree under which it is sought.

*Affirmed.*

MR. JUSTICE BLACK and MR. JUSTICE BLACKMUN took no part in the consideration or the decision of this case.

MR. JUSTICE DOUGLAS, with whom MR. JUSTICE BRENNAN and MR. JUSTICE WHITE concur, dissenting.

The antitrust decree before us last Term in *United States* v. *Armour & Co.*, 398 U. S. 268, is here again in a new posture. Under the original decree of 1920 the defendants were required to abandon their interests in a wide variety of food and nonfood lines. They were required to divest themselves of any interest in the businesses of "manufacturing, jobbing, selling, transporting . . . distributing, or otherwise dealing in" some 114 specified food products and some 30 other products.

They were enjoined from "owning, either directly or indirectly . . . any capital stock or other interests whatsoever in any corporation . . . which is in the business, in the United States, of manufacturing, jobbing, selling, transporting . . . distributing, or otherwise dealing in any" of the prohibited products. Under the decree the District Court retained jurisdiction "for the purpose of taking such other action or adding to the foot of this decree such other relief, if any, as may become necessary or appropriate for the carrying out and enforcement of this decree."

Armour, one of the parties to the decree, is now the second largest meatpacker in the United States with total assets of almost $700 million and total sales in 1967 of approximately $2,150,000,000. In addition to meatpacking, Armour manufactures, processes, and sells various nonprohibited products. In early 1969 the Government filed a petition in Federal District Court to make General Host Corp., a company engaged in the manufacture and sale of numerous food products, a party to the decree and forbid it from acquiring control of Armour. The District Court held that the decree prohibited Armour from holding any interest in a company handling any of the prohibited products but did not prohibit such a company from acquiring Armour. The Government appealed the decision arguing that acquisition by General Host of a majority of Armour's stock would be in violation of the decree and General Host should have been made a party to the decree so that an injunction could issue. We noted probable jurisdiction. 396 U. S. 811.

In the interim, General Host entered into an agreement to sell its controlling stock interest in Armour to Greyhound, a regulated motor carrier. The Interstate Commerce Commission approved the acquisition. Following

Greyhound's acquisition, the Court dismissed the case as moot. 398 U. S. 268.

The Government then filed a new petition in the District Court alleging (as it had against General Host) that Greyhound is engaged in businesses forbidden to Armour, or any firm in which Armour has a direct or indirect interest, and therefore Greyhound's acquisition violates the decree. The petition prayed that Greyhound be brought before the Court under § 5 of the Sherman Act and that an order supplemental to the original decree be entered enjoining Greyhound from acquiring any additional stock or exercising control over or influencing the business affairs of Armour, and requiring Greyhound to divest itself of the Armour stock. The District Court dismissed the Government's complaint, ruling that since Greyhound was not a party to the original decree, Greyhound may not be enjoined from "committing any acts on the ground that they are prohibited by the decree." The court also rejected the Government's argument that acquisition of the Armour stock placed the two companies in a "corporate relationship" which was prohibited by the decree. The court stated "the decree does not speak in terms of corporate relationships; it speaks in terms of the defendants dealing in the specified lines of commerce . . . ." The Government appealed.

The Sherman Act (15 U. S. C. § 5) provides:

> "Whenever it shall appear to the court before which any proceeding under section 4 of this title may be pending, that the ends of justice require that other parties should be brought before the court, the court may cause them to be summoned, whether they reside in the district in which the court is held or not; and subpoenas to that end may be served in any district by the marshal thereof."

Under § 5 and the All Writs Act (28 U. S. C. § 1651 (a)) the District Court has ample power to prevent frustration of the original decree.

Greyhound may well have devised a plan which would render the original decree nugatory.

Under the decree, none of the meatpackers could own a chain of grocery stores. Yet under the interpretation of the District Court a chain of grocery stores could acquire a meatpacking company. I do not view the decree so narrowly. The evil at which the decree is aimed is combining meatpackers with companies in other food product areas.

The authorities support the proposition that judges who construe, interpret, and enforce consent decrees look at the evil which the decree was designed to rectify. See Note, Flexibility and Finality in Antitrust Consent Decrees, 80 Harv. L. Rev. 1303, 1315.* My interpretation of the evil at which this decree was aimed is the same as that of Mr. Justice Cardozo, writing for this Court in *United States* v. *Swift & Co.,* 286 U. S. 106. As we stated in *Chrysler Corp.* v. *United States,* 316 U. S. 556, 562, the test for reviewing modifications is "whether the change served to effectuate or to thwart the basic purpose of the original consent decree."

Neither *Hughes* v. *United States,* 342 U. S. 353, nor *United States* v. *Atlantic Refining Co.,* 360 U. S. 19, relied on by the Court, is to the contrary. *Hughes* involved a Government attempt to require the trustee to sell stock in a voting trust where the consent decree expressly allowed Hughes a choice of selling the stock himself or placing the stock in a voting trust "until Howard R. Hughes shall have sold his holdings of stock." *Atlantic*

---

*See the cases cited in Note, Requests by the Government for Modification of Consent Decrees, 75 Yale L. J. 657, 667–668, n. 56.

*Refining* was a case where for 16 years, right until the eve of the litigation, both parties had construed the decree in one way. Then the Government changed its interpretation not because it would effectuate the purposes of the decree but because it "would more nearly effectuate 'the basic purpose of the Elkins and Interstate Commerce Acts.'" 360 U. S., at 23.

The evil at which the present decree is aimed—combining meatpackers with companies in other food product areas—is present whether Armour purchases a company dealing in the various prohibited food lines or whether that company purchases Armour. When any company purchases Armour it acquires not only Armour's assets and liabilities, but also Armour's legal disabilities. And one of Armour's legal disabilities is that Armour cannot be combined with a company in the various food lines set out in the decree.

I read the decree to prohibit any combination of the meatpacking company defendants with companies dealing in various food lines.

In the District Court the Government offered an affidavit which showed that Greyhound deals in food products through its divisions and wholly owned subsidiaries, which provide industrial catering services, and operates restaurants, cafeterias, and other eating facilities. The affidavit states that in 1969 Greyhound had revenues of about $124 million from food operations which accounted for over 16% of Greyhound's total revenues that year. Greyhound has contended that it operates no grocery business and only buys raw foodstuffs and sells prepared meals. Thus, Greyhound argues, it can acquire Armour even if it is made a party to the decree because the decree does not prohibit meatpackers from entering the restaurant business. I do not pass on this contention. Rather,

688

I would reverse the judgment of the District Court and remand the case to that court for any further proceedings which are necessary to determine if Greyhound's acquisition of Armour violates the decree. If it does, then the District Court should make Greyhound a party to that decree.