UNITED STATES of America, Plaintiff,

v.

AMERICAN SOCIETY OF CIVIL ENGINEERS, Defendant.

No. 72 Civ. 1776 (JMC).

United States District Court, S. D. New York.

Aug. 4, 1977.

---

Thomas E. Kauper, Asst. Atty. Gen., U.S. Dept. of Justice, Antitrust Div. and Bernard M. Hollander, Chief, Judgment Enforcement Section, Washington, D.C., for plaintiff United States Government; Stephen F. Sonnett, Kenneth L. Jost, Ruth Dicker, Washington, D.C., of counsel.

Cleary, Gottlieb, Steen & Hamilton, Washington, D.C., for defendant American Society of Civil Engineers; Fred D. Turnage, Kenneth L. Bachman, Jr., John S. Magney, Washington, D.C., of counsel.

## OPINION AND ORDER

CANNELLA, District Judge:

The Government's motion for an order adjudging defendant, the American Society of Civil Engineers ["ASCE" or "Society"], in contempt of a consent decree entered on June 1, 1972, is hereby granted.

## FACTS

On May 1, 1972 the United States filed suit against the American Society of Civil Engineers alleging that Section 1 of the Sherman Act, 15 U.S.C. § 1, had been violated and requesting that ASCE be enjoined from enforcing any provision of its Code of Ethics that had as its purpose or effect the restriction of price competition among Society members. On the same day the parties executed a stipulation settling the litigation. Pursuant to this stipulation and a consent judgment entered into thereunder, the Society was, *inter alia,*

enjoined and restrained from adopting any plan, program or course of action which prohibits members of the defendant from at any time submitting price quotations for engineering services.

On February 7, 1975 Franklin Y.K. Sunn, president of Metcalf & Eddy Limited ["M&E"] and George K. Tozer, vice president of M&E, were found guilty of violating Article 3 of the ASCE Code of Ethics and suspended from the Society for periods of three and two years, respectively. Article 3 of the Code provides that

[i]t shall be considered unprofessional and inconsistent with honorable and dignified conduct and contrary to the public interest for any member . . . :

To attempt to supplant another engineer in a particular engagement after definite steps have been taken toward his employment.

Also implicated was paragraph 1 of Article 3 of the Society's Guide to Professional Practice Under the Code of Ethics, which states that

[a member] shall not continue to seek employment on a specific engagement after being advised that another engineer has been selected subject to approval of detailed arrangements.

The Government contends that Messrs. Sunn and Tozer were disciplined under these "attempt to supplant" provisions for doing nothing more than submitting price quotations, an activity that is protected under the May 1, 1972 agreement and subsequent judgment. The Society defends its actions and argues that the submission of price quotations by Sunn and Tozer constitutes an "attempt to supplant," an independent violation of the Code of Ethics that is punishable notwithstanding the 1972 consent decree.

This being the posture of the case, an examination of the events that gave rise to the disciplinary proceedings is in order. The following chronology is reconstructed from the proceedings before the ASCE Board of Direction[1] and other documents before the Court.

On December 26, 1972 the Board of Directors of the Metropolitan Water Works Authority of Bangkok, Thailand ["MWWA" or "Authority"] established a committee and authorized it to begin negotiations with a joint venture composed of Black & Veatch International Ltd. ["BVI"] and Camp Dresser & McKee Ltd. ["CDM"], two engineering firms, regarding supervision of a proposed water works construction project. The joint venture was called BVI-CDM Associates ["BVI-CDM"]. Formal negotiations began on February 7, 1973 and a tentative accord was reached on July 11, 1973. On July 19 the MWWA Board of Directors empowered the Authority to engage BVI-CDM as the engineering concern for supervision of the construction project and to issue a letter of intent to that effect.[2]

After formal negotiations with BVI-CDM had commenced, but before the joint venture was actually hired by the Authority, Metcalf & Eddy received a telegram from an engineering consulting firm known as Thai Engineering Consultants Co., Ltd. ["TEC"] advising M&E of an available "water supply construction supervision contract" in Bangkok, Thailand and inquiring if it was interested.[3] Sunn immediately

---

1. Under the constitution and by-laws of the Society, complaints concerning possible ethical code violations are referred to the Committee on Professional Conduct ["CPC"] for investigation. If the CPC determines that there may have been a violation, it refers the complaint to the Board of Direction to conduct a hearing.

2. In the view of the ASCE Board of Direction BVI-CDM was the only consultant with which the MWWA was negotiating after February 7, 1973. Thus, the Board concluded, after February 7 definite steps had been taken toward the employment of BVI-CDM by MWWA.

3. Our firm address Thai Engineering Consultants Co. Ltd 146 Rama I Bangkok stop We are local consulting engineers founded 12 years ago stop Immediate potential exists for five year Bangkok water supply construction supervision contract stop If you are interested to associate with our firm we will send you all the details by Telex Please give us your Telex address

wired back, expressing M&E's enthusiasm.[4] As a consequence, TEC tendered its projection of the maximum man-months required for the project and requested that M&E submit an estimate of the man/month cost per job classification. After receiving still another Telex apparently designed to further whet its appetite and encourage a streamlined cost estimate,[5] M&E answered TEC's inquiry with the sought-after information.

Armed with this data, TEC approached General Charusathira Prapass, Thailand's Minister of the Interior and Chairman of the Board of the MWWA, with a suggestion that a joint venture between TEC and either Metcalf & Eddy or another engineering firm could be substituted for BVI–CDM on the water works project at a substantial savings.[6] On July 23, 1973 TEC sent a similar, albeit more detailed, letter to General Prapass. In essence, this letter indicated that TEC and one of two named engineering consultants (one being Metcalf & Eddy) could provide the required supervisory services with no loss of expertise and little loss of time at a greatly reduced cost.

The next day, apparently because of TEC's intervention, Prapass instructed the MWWA to study BVI–CDM's proposed fee in comparison with that of "a local firm." On July 25 the MWWA requested that TEC get confirmation from M&E that it would participate in a joint venture with TEC on the water works project and that it would do so for the previously quoted fee. TEC forwarded this request to M&E, on whose behalf Tozer responded, confirming both the cost estimate and M&E's enthusiasm about the project.

On September 12, 1973, as a result of the comparison between BVI–CDM's proposed fee and the figures submitted by TEC, the MWWA decided to reject the BVI–CDM proposal because "the fees quoted far exceed reasonable estimates for such services,"[7] and solicit one from TEC and M&E. BVI–CDM was notified of this decision by letter dated September 20, 1973; a letter dated September 21, 1973 so informed M&E. Negotiations ensued and on December 24, 1973 the joint venture composed of TEC and M&E was formally selected for

Text of Telex from Prakob Dej Udom, President, Thai Engineering Consultants Co., Ltd. to Franklin Y.K. Sunn, President, Metcalf & Eddy Limited, dated June 5, 1973.

4. We are enthusiastic about joint venturing with you on this work stop However we assume that negotiations between Metropolitan Water Works and Black and Veatch and Camp Dresser would be terminated before preliminary negotiations initiated with us stop Please send details stop Our TWX NUMBER 7103216365.

Telex from Franklin Y.K. Sunn to Prakob Dej Udom, dated June 6, 1973.

5. Re Bangkok Water Supply Project present proposed fee is extremely excessive stop We were unofficially approached to obtain estimates from reliable firm to confirm expected savings for Thai Government of a few million dollars stop If your figures confirm such feeling we will be able to obtain invitation from authority without your involvement in breaking present negotiation after which your firm and ours joint venture will be solely invited to negotiate stop Imperative that you move fast supplying us with requested costs or it may be too late stop Items 8 chief cost schedule engineer stop.

Telex from Prakob Dej Udom to Franklin Y.K. Sunn, dated June 11, 1973.

6. 1. TEC understands cost of BVI–CDM contract is 243 million Baht.[a]

TEC claims they can provide service at saving of 57 million.

2. TEC claims BVI–CDM taking advantage of Thai Government and people and that BVI–CDM fooled negotiating committee.

3. TEC claims they are familiar with all aspects of design.

4. TEC claims they are just as qualified to do the supervision as BVI–CDM.

5. TEC proposes Minister terminate negotiations with BVI–CDM.

6. TEC proposes to employ a qualified foreign consultant to assist in work and states that arrangements have been discussed with (and agreed to by) two firms—Ralph M. Parsons and Metcalf & Eddy. Countries where each firm has or is working are listed (also states).

a. Baht is the unit of currency used in Thailand. 20.8 Baht = One U.S. Dollar.

Letter from W. D. Morgan of Thai Engineering Consultants Co., Ltd. to General Prapass, dated June 26, 1973.

7. Letter from Krachok Suprituilppkahn, Acting General Manager of MWWA, to D.G. MacLean of CDM, dated September 20, 1973.

design review and construction supervision of the water works project. On February 11, 1974 MWWA issued a letter of intent authorizing M&E and TEC to proceed.

Based upon the above events, both Sunn and Tozer were charged with and found guilty of violation of the ASCE Code of Ethics because they

> approved joining with the firm of Thai Engineering Consultants Co., Ltd., in submitting a proposal for engineering work to the Metropolitan Water Works Authority (MWWA), Bangkok, Thailand, with the knowledge and understanding that negotiations between MWWA and the Joint Venture of Black & Veatch International Ltd.—Camp Dresser & McKee, Inc. (BVI–CDM) were in progress.

## DISCUSSION

### Civil Contempt Standard

■ Civil contempt is established when it is proved by clear and convincing evidence [8] that there is a lawful order and that such order was violated. *United States v. Greyhound Corp.,* 363 F.Supp. 525, 570 (N.D.Ill. 1973). Wilfulness need not be shown. *McComb v. Jacksonville Paper Co.,* 336 U.S. 187, 191, 69 S.Ct. 497, 93 L.Ed. 599 (1949); *United States v. Greyhound Corp., supra.* The existence of a lawful order is not contested by the defendant.[9] Thus, the only issue for the Court's adjudication is whether defendant's actions violated the consent decree.

### Violation of the Order

In very simple terms, Section III of the consent judgment enjoins the defendant "from adopting any plan, program or course of action which prohibits members of the defendant from *at any time* submitting price quotations for engineering services." (emphasis added).

■ At the threshold, defendant argues that neither Sunn nor Tozer were disciplined for submitting price quotations, but rather for an independent ethical code violation, an attempt to supplant. Referring to a provision of the code of ethics of the American Institute of Certified Public Accountants,[10] ASCE argues that otherwise unethical conduct remains subject to disciplinary sanctions "regardless of whether or not such unethical conduct is preceded by, associated with, or followed by a submission of price quotations. . . ." Although the Court agrees with this proposition, it has no application where, as here, no otherwise unethical conduct was preceded by, associated with or followed by the submission of price quotations. Sunn and Tozer *did no more* than submit a price quotation, M&E's estimated charge for a job requiring a particular number of man/months.[11]

The fee quoted by Metcalf & Eddy in the June 12 Telex was merely a response to an inquiry regarding the cost of a project on which certain employees of M&E would be required to devote a specified amount of time. M&E had no information regarding the magnitude of the job or the amount of work involved. The July 26, 1973 letter from Tozer to Prakob Dej Udom [12] essentially confirmed the cost estimate and reit-

---

8. *Hart Schaffner & Marx v. Alexander's Dep't Stores, Inc.,* 341 F.2d 101 (2d Cir. 1965) (per curiam); *Stringfellow v. Haines,* 309 F.2d 910, 912 (2d Cir. 1962); *Coca-Cola Co. v. Feulner,* 7 F.Supp. 364, 365 (S.D.Tex.1934).

9. Nor for that matter is the jurisdiction of the Court, which is predicated on the following provisions of Section IX of the consent judgment:

> Jurisdiction is retained for the purpose of enabling any of the parties to this Final Judgment to apply to this Court at any time for such further orders and directions as may be necessary or appropriate for the construction

or carrying out of this Final Judgment, . . . or for the enforcement of compliance therewith, and for the punishment of violations of any of the provisions contained [therein].

10. This provision apparently has not been challenged by the Justice Department to date.

11. ASCE's further argument, that providing an estimate of man/month costs is different from submission of a price quotation, is frivolous.

12. Prakob Dej Udom was TEC's president at the time.

erated M&E's position that it would not become further involved until the MWWA broke off negotiations with BVI–CDM.

Likewise, the two letters sent by TEC to General Prapass merely stated that TEC, together with a qualified foreign consultant (to wit, M&E), could supervise the water works project as well as BVI–CDM, but at a substantial savings. This was in essence the submission of a price quotation. Thus, it cannot be maintained that Sunn and Tozer were suspended for doing anything more than supplying price information for engineering services.[13]

ASCE also maintains that the 1972 consent decree was not meant to prohibit the submission of price quotations if done at a time when such activity would violate the "attempt to supplant" provisions of the Code of Ethics. The Society argues that the sole purpose of the 1972 litigation was the elimination of its blanket prohibition of price competition; it was not meant to affect submission of price information in certain other situations, such as the one presently before the Court.

■ While an argument such as this might have proven persuasive if presented to a court responsible for formulating relief under the original complaint, it is out of place here, where the Court deals with the construction of a consent decree. See *United States v. Armour & Co.*, 402 U.S. 673, 681, 91 S.Ct. 1752, 29 L.Ed.2d 256 (1971). The Court's task in such a case is to give full effect to the plain meaning of the decree.[14] *United States v. Browning*, 518 F.2d 714, 717 (10th Cir. 1975). In that a consent decree represents a carefully

worked-out agreement between the parties and is executed in exchange for the right to litigate the issues, it must be applied as written, not as it might have been written. *United States v. Armour & Co.*, 402 U.S. 673, 677–82, 91 S.Ct. 1752, 29 L.Ed.2d 256 (1971); *Hart Schaffner & Marx v. Alexander's Dep't Stores, Inc.*, 341 F.2d 101 (2d Cir. 1965) (per curiam).

■ Applying these principals, defendant's interpretation of the decree must be rejected. The decree, and particularly Section III thereof, enjoins ASCE from prohibiting the submission of price quotations for engineering services *whenever it occurs.* ASCE seeks to have the Court engraft onto Section III the words "except when the submission of price quotations constitutes an attempt to supplant." Such a construction flies in the face of the plain meaning of the judgment. If the parties had agreed to such an exception, it would have been a simple matter to include language to memorialize it. *See United States v. Armour & Co.*, 402 U.S. 673, 679, 91 S.Ct. 1752, 29 L.Ed.2d 256 (1971).

Accordingly, the Court finds by clear and convincing evidence that, in disciplining Franklin Sunn and George Tozer, the American Society of Civil Engineers violated the consent judgment entered on June 1, 1972 in this case.[15]

*Relief*

The American Society of Civil Engineers is directed to reinstate Franklin Sunn and George Tozer as members in good standing of the Society and to expunge from their

---

**13.** It is noteworthy that during their deliberations on the Sunn and Tozer charges, the ASCE Board of Direction was exclusively concerned with M&E's submission of the cost estimate in response to TEC's inquiry.

**14.** Because a consent decree is to be construed in much the same manner as a contract, aids to construction may be used where its terms are ambiguous. *United States v. ITT Continental Baking Co.*, 420 U.S. 223, 238 & n.11, 95 S.Ct. 926, 43 L.Ed.2d 148 (1975). However, as indicated below, the judgment in the instant case is crystal clear.

**15.** At trial, certain documents were offered into evidence and objected to on grounds of relevance. The Court reserved decision. These documents include the codes of ethics of other professional societies, complaints filed by the Justice Department against other professional societies, and consent judgments entered in these suits. Because the Court finds that these exhibits are not material to the issues it decides today, the objections to admission of defendant's exhibits A, B, C, E, F, G, J, K, L, M, Q, R and HH are sustained. The objection to receipt of defendant's exhibit CC into evidence is also sustained.

records any mention of the disciplinary proceedings.

Because notice of the suspensions appeared in the March 1975 issue of the publication *Civil Engineering*, defendant is further ordered to publish in that magazine a notice stating that these disciplinary actions were taken in violation of the consent judgment and that the activities did not constitute unethical conduct.

The Society is directed to accord similar treatment to any other members disciplined under Article 3 of its Code of Ethics solely for submitting price quotations after definite steps had been taken toward another engineer's employment.

In addition to the above, the Government requests the complete elimination of Article 3 of the ASCE Code of Ethics. This relief is unwarranted. The Court has before it what is in reality merely a single instance in which Article 3 was applied in violation of the consent decree. There is no reason to believe that it has been or will be used to thwart the purposes of the consent decree. However, the Court does direct the Society to refrain from enforcing Article 3 in a manner which inhibits the submission of price quotations for engineering services.

The foregoing constitute the findings of fact and conclusions of law of the Court pursuant to Rule 52(a) of the Federal Rules of Civil Procedure.

The Government is directed to submit, on notice within ten days, a proposed order adjudging the defendant in contempt.

SO ORDERED.