T.C. Memo. 2003-41

UNITED STATES TAX COURT

ESTATE OF LUCILLE ABBOTT SEXTON, DECEASED, ANN SEXTON
PETERSON, EXECUTOR, Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket Nos. 19418-98, 3076-99.      Filed February 24, 2003.

Robert Patrick Sticht, for petitioner.

Elaine T. Fuller, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

GERBER, Judge:  These consolidated cases[1] were closed by the
Court based on stipulated decisions executed by the parties on
January 23, 2001.  On April 23, 2001, the estate's motions to
vacate decisions were filed, alleging a conflict of interest on

_____

[1] Both cases involve the same estate, one concerning estate
tax and the other gift tax.

the part of the attorney who represented the estate and executed the decisions as the estate's legal representative.  In particular, the estate, which is represented by new counsel, contends that its former counsel had a conflict of interest because he was employed by respondent concerning a different case at the same time he was representing the estate and executed the agreed decision documents.  Respondent contends that the circumstances we consider do not warrant the vacating of the decisions.

## FINDINGS OF FACT[2]

Lucille Abbott Sexton (decedent) died on June 21, 1994.  A Form 706, United States Estate (and Generation-Skipping Transfer) Tax Return, was timely filed.  The estate did not report any taxable gifts or any debt owed to decedent by decedent's daughter (Ann Peterson), son-in-law (Bruce Peterson), or their partnership (Peterson Properties).  Further, it was contended by the estate that decedent had a 20-percent interest in the partnership and that she owed the partnership $200,000, as evidenced by an unsecured note.  The $200,000 note was claimed as a debt of decedent on the estate tax return.

During February 1996, respondent notified the estate that it was to be examined and the estate retained, as its

---

[2] The parties' stipulation of facts is incorporated by this reference.

representative, the accountant who prepared its estate tax return. On September 16, 1996, respondent sent the estate's accountant a discussion draft of a proposed Form 1273, Report of Estate Tax Examination Changes, reflecting a $472,143 increase in estate tax.

The estate hired Attorney Dennis G. Harkavy to represent it and to address the discussion draft received from respondent. Mr. Harkavy's engagement to represent the estate was reduced to writing in the form of a letter dated October 25, 1996. Respondent issued a 30-day letter on October 1, 1997, proposing to increase the estate tax from the $68,894 reported to $415,868. On October 9, 1997, respondent received Mr. Harkavy's letter seeking to protest the findings of the 30-day letter and requesting a conference with Appeals. A decision was made by Appeals not to extend a conference to the estate, and the matter was referred for issuance of a notice of deficiency. Notices of deficiency were issued to the estate for estate tax and gift tax.

The estate tax deficiency was based upon the determination that transfers totaling $930,350 from decedent to her daughter (Mrs. Peterson), son-in-law (Mr. Peterson), and Peterson Properties (partnership) were taxable gifts. Respondent also disallowed a $200,000 claimed reduction from the gross estate for the $200,000 unsecured note to the partnership. Harkavy executed

petitions and caused them to be filed with this Court on behalf of the estate.

Mrs. Peterson had informed Mr. Harkavy that the $200,000 unsecured note payable to the partnership and reported in the estate tax return represented the decedent's obligation to make a capital contribution to acquire a 20-percent interest in the partnership. Although Mr. Harkavy did not believe that the $200,000 deduction would be sustained, he advanced that item on the estate's behalf with respondent. In response to respondent's counsel during settlement discussions, Mr. Harkavy conceded the $200,000 disallowance of the unsecured note and the resulting adjustment.

The gift tax deficiencies were based on respondent's determinations that checks in the amounts of $120,000 for 1994, $281,100 for 1993, $303,400 for 1992, and $225,850 for 1991 were all taxable gifts made to the partnership. The estate petitioned this Court with respect to the estate and gift tax notices of deficiency, and both cases were answered by respondent and placed in issue.

The estate did not express or argue the position that the $930,350 in checks given by decedent to the partnership during the last 3 years of her life, were contributions to capital.[3]

---

[3] If the estate's motion is granted, the estate intends to argue that the $930,350 was a contribution to the partnership's capital.

The Appeals officer proposed a settlement in which the gross estate would be reduced by 25 percent ($232,587) of the $930,350 adjustment. After the Appeals office closed the estate's cases as being "unagreed", respondent's counsel, Jack Klinghoffer, and Mr. Harkavy conferred regarding the cases. Mr. Klinghoffer, during December 1999, sent tax computations which reflected the settlement offer made by the Appeals officer, with an additional $16,000 allowance for administrative expenses. Mr. Harkavy conveyed the offer to the Petersons and during January 2000, Mr. Harkavy wrote to Mr. Klinghoffer and rejected the December offer to settle.

Thereafter, the estate began preparation for trial and during a July 2000 meeting with Mrs. Peterson, Mr. Harkavy informed her that he was "doing some work with the IRS". Mr. Harkavy did not disclose the specifics of his work with the Internal Revenue Service (IRS). Mrs. Peterson, based on the above explanation, did not understand that Mr. Harkavy was employed by respondent as a consultant or expert witness in another case. If Mrs. Peterson had known that Mr. Harkavy was employed by respondent at the same time that he was representing the estate, she would have terminated his representation of the estate.

These consolidated cases were scheduled for the October 16, 2000, Los Angeles trial session. After the Court received the parties' trial memoranda, a conference call was initiated with

the parties' attorneys.  During the conference call, the trial Judge expressed a generally unfavorable view of the estate's position in these cases.  After the call, Mr. Harkavy contacted Mrs. Peterson concerning the conference call and explained that the Judge had a negative view of the estate's position.  Mr. Harkavy recommended to Mrs. Peterson that they should attempt to reinstate the December 1999 settlement offer.  Mrs. Peterson agreed to that course of action based on her belief that "the Judge had already made up his mind".[4]

Mr. Harkavy contacted Mr. Klinghoffer and inquired whether settlement was still possible.  Mrs. Peterson was contacted by Mr. Harkavy at approximately noon on October 3, 2000, and was advised that negotiations were ongoing and that a final decision would have to be made by 5:00 p.m. that same day.  Prior to that time, Mrs. Peterson had learned that the estate's accountant was being called as a favorable witness for respondent.  Mrs. Peterson contacted her accountant on October 3, 2000, to garner his support for the estate's position, but he refused.

Ultimately, on October 3, 2000, Mrs. Peterson called Mr. Harkavy's office and agreed to the settlement, which ended up being the same as the offer made by Appeals during December 1999. The terms of the settlement agreement were embodied in a Stipulation of Agreed Issues and signed by Mr. Harkavy on October

---

[4] The pretrial Judge is a different Judge from the one who is considering the estate's motions.

5, 2000, and, ultimately, reflected in agreed or stipulated decision documents signed by the parties' attorneys and filed with the Court on January 23, 2001.

Mr. Harkavy was employed by respondent on September 29, 1998, to help determine the rights of a partnership in connection with agreements executed with the Community Redevelopment Agency's construction of a 73-story office building in downtown Los Angeles. Lorene Sams is a contracting officer employed by respondent, in part, to facilitate the contracting for and procurement of expert witnesses. Ms. Sams was requested by her manager in the Appeals Office to hire an expert in a case commonly known as the "McGuire Partners" case. Ms. Sams prepared a statement of work and contacted the Los Angeles County Bar Association referral service to obtain a list of attorneys with expertise in the legal question in the McGuire Partners case. She received a list of 6 to 10 attorneys from the bar association, which included Mr. Harkavy's name. The request for bids issued by respondent included the following statement of work:

> 1. The Contractor shall travel to the Taxpayer Representative's office in Los Angeles, CA. While there, the Contractor shall peruse documents relating to the series of transactions described and shall determine which documents the Contractor requires to review. The Contractor shall notify the IRS, in writing, outlining the specific documents which the Contractor's [sic] requires copies of. The IRS will request copies of these documents and provide copies to the Contractor within 5 weeks after date of notification.

2.  The Contractor shall review all documents relating to the series of transactions described above to determine:

    (1) exactly what rights were purchased;

    (2)  whether these rights remain even after the life of the building has expired; and

    (3) the useful life of these rights

3. The Contractor shall convey the results of its review, research and analysis in a written narrative appraisal report, with adequate supporting documentation to enable the reader to follow the thought process throughout the entire report, and arrive at the logical conclusion.

    OPTIONAL LINE ITEM:

4.  At the option of the Government, the Contractor may be required to provide up to (8) hours of consultation time and travel to the Los Angeles area to attend a closing conference with IRS personnel and taxpayer representatives to discuss the findings.  At this conference, the Contractor shall interface with taxpayer experts in discussing this issue.

5.  At the option of the Government, the Contractor may be contacted to provide any appropriate pre-trial preparation and trial testimony in U.S. Tax Court.

Mr. Harkavy made a Contract Proposal with respect to the request for bids, which added the following services to those set forth in the request for bids:

4. Research underlying Code Sections, Regulations and Court Cases.  Research should initially concentrate on the threshold questions of whether air rights, FARs, and TDRs are solely allocable to land, and therefore not depreciable, or alternatively, an allocation should be made between land and improvements.  If an allocation is required, the criteria for this allocation must be established.

In selecting Mr. Harkavy, Ms. Sams considered cost, experience in the specialty, and potential to serve as an expert witness. Ms. Sams did not perform a conflicts analysis to determine if a potential for conflict of interest existed. She was unaware that Mr. Harkavy had a power of attorney on file with respect to his representation of the Sexton estate. Under the contract, Mr. Harkavy's charge was to determine the rights of a partnership in connection with certain agreements. He was not hired by respondent to represent respondent's interests as counsel in the McGuire Partners case. Mr. Harkavy's involvement in the McGuire Partners case was concurrent with his representation of the Sexton estate in these consolidated cases. Mr. Harkavy did mention to respondent's Appeals officer in these consolidated cases that he had been hired as an expert witness by respondent in an income tax case.

In connection with his consulting position on the McGuire Partners matter, Mr. Harkavy consulted and corresponded with the Appeals officer assigned to that matter. He also had communications with the Chief of Appeals and a disclosure officer in respondent's office. Mr. Harkavy entered into a nondisclosure agreement with respect to the taxpayer information he was exposed to regarding the McGuire Partners case.

While Mr. Harkavy was representing the estate, respondent's attorney, Mr. Klinghoffer, became aware of Mr. Harkavy's

consulting position with respondent and that Mr. Harkavy had prepared an expert witness report for Appeals. An attorney in Mr. Klinghoffer's office, who was handling the McGuire Partners case, asked Mr. Klinghoffer about Mr. Harkavy. Mr. Klinghoffer explained that Mr. Harkavy was "doing a very good job for his client." After becoming aware that Mr. Harkavy had been hired as an expert witness for respondent, Mr. Klinghoffer inquired of Mr. Harkavy whether he had informed the estate of his employment. Mr. Harkavy told Mr. Klinghoffer that he had informed the client. Respondent's attorney on the McGuire Partners case decided not to use Mr. Harkavy as an expert witness, and a different attorney was hired as an expert. Respondent's attorney's reason for not using Mr. Harkavy had nothing to do with the fact that Mr. Harkavy represented the estate or with whether he may have had a conflict of interest.

Mr. Harkavy did not believe that he had a conflict of interest in representing the estate at the same time he performed consulting work with respondent. He completed the first part of his consulting contract on or before February 1999, and his active consulting work ended approximately July 1999, almost 6 months before the December 1999 settlement was rejected and more than a year before Mr. Harkavy executed the stipulation decision in this case. Mr. Harkavy submitted his final invoice to respondent for the consulting on August 16, 1999. Mr. Harkavy's

fees under his consulting contract totaled $18,250--$2,000 of which was for his attendance at the optional closing conference between respondent's personnel and the taxpayer's representative in the McGuire Partners case.  Mr. Harkavy was not requested to testify as an expert witness in connection with his opinion on the McGuire Partners case.

OPINION

In this case, the estate sought leave to move to vacate decisions entered by the Court based on an agreement of the parties.  In that regard, the estate's motions were filed after the 30-day period permitted for moving to vacate a decision without leave of the Court under Rule 162.[5]  The Court permitted the estate's motions to vacate to be filed on the 90th day from the entry of decision.  Accordingly, regardless of whether the parties stipulated the decisions or whether the agreed decision had been approved and entered by the Court, it had not become final within the meaning of section 7481.

The estate contends that the decisions are flawed and should be vacated because the estate's representative had a conflict of interest and because the estate, if permitted to litigate, would be successful in substantially reducing the estate tax deficiency

---

[5] Unless specified otherwise, all Rule references are to the Tax Court Rules of Practice and Procedure, and all section references are to the Internal Revenue Code in effect for the period under consideration.

to which it had agreed. Respondent contends that the parties entered into a valid agreement and the circumstances of this case do not warrant the setting aside of that agreement.

The estate was represented by an attorney, who was serving as a consultant for respondent on another case. The estate contends that Mr. Harkavy was representing the IRS at the same time he was representing the estate. We have found that the two cases were unrelated and that Mr. Harkavy did not "represent" respondent in the unrelated case. In particular, Mr. Harkavy provided an opinion as to the rights of a partnership under agreements executed with the Community Redevelopment Agency regarding the construction of a 73-story office building.

The estate contends that Mr. Harkavy's relationship with respondent was in violation of model rule 1.7 of the Model Rules of Professional Conduct (ABA 2003). Model rule 1.7(a) generally provides that "a lawyer shall not represent a client if the representation involves a concurrent conflict of interest." In particular, the estate relies on subpart (1) of model rule 1.7(a), which provides that a conflict exists if "the representation of one client will be directly adverse to another client". Under that provision, a conflict occurs only where the representation of clients is directly adverse.

While Mr. Harkavy had an attorney/client relationship with the executor and estate, he did not have an attorney/client

relationship with respondent.  The American Bar Association

Standing Committee on Ethics and Professional Responsibility, in

Formal Opinion 97-407, at 1101:134 (1997), provided the following

guidance:

> A lawyer who is employed to testify about requirements
> of law or standards of legal practice, for example,
> acts like any non-lawyer expert witness.  The
> testifying expert provides evidence that lies within
> his special knowledge by reason of training and
> experience and has a duty to provide the court, on
> behalf of the other law firm and its client, truthful
> and accurate information.  To be sure, the testifying
> expert may review selected discovery materials, suggest
> factual support for his expected testimony and exchange
> with the law firm legal authority applicable to his
> testimony.  The testifying expert also may help the law
> firm to define potential areas for further inquiry, and
> he is expected to present his testimony in the most
> favorable way to support the law firm's side of the
> case.  He nevertheless is presented as objective and
> must provide opinions adverse to the party for whom he
> expects to testify if frankness so dictates.

This formal opinion makes a distinction between an attorney's

representation or advocacy of a client's interests and an

attorney's role as a consultant or expert witness.

The estate has argued that doing legal research and

providing legal opinions is the type of work that attorneys

usually perform for clients.  The distinction made by respondent,

however, is that Mr. Harkavy did not represent the interests of

the IRS.  Under that interpretation, Mr. Harkavy's contractual

relationship with the IRS would not rise to the level of an attorney/client relationship and model rule 1.7(a)(1) might not apply.[6]

The estate also argued that model rule 1.7(a)(2) applied. That rule provides that a conflict of interest exists if

> there is a significant risk that the representation of one or more clients will be materially limited by the lawyer's responsibilities to another client, a former client or a third person or by a personal interest of the lawyer.

This rule is, in some respects, more inclusive than model rule 1.7(a)(1).[7] However, we need not and do not decide whether Mr. Harkavy committed a violation of paragraph (a)(1) or (a)(2) in model rule 1.7. Even assuming arguendo that a conflict of interest did arise under these rules, we must consider the effect, if any, it had on Mr. Harkavy's representation of the estate.

---

[6] Mrs. Peterson testified that, as executor of the estate, if she had become aware that Mr. Harkavy had been working for respondent at the same time he was representing the estate, she would have terminated the relationship. While we appreciate Mrs. Peterson's sentiment, by itself, it is not a reason for vacating an agreed decision.

[7] With respect to its conflict argument, the estate also argued that Mr. Harkavy should have made full disclosure of his relationship with respondent and obtained the estate's consent to same as required in model rule 1.7(b). In that regard, Mr. Harkavy testified that he had informed Mrs. Peterson of his involvement with the Internal Revenue Service (IRS). There is disagreement about whether Mrs. Peterson understood that Mr. Harkavy was employed by the IRS.

In that regard, the estate relied on Wilson v. Commissioner, 500 F.2d 645 (2d Cir. 1974), where the Court of Appeals for the Second Circuit reversed and remanded this Court's denial of a motion to vacate. The Court of Appeals found that the taxpayer in that case was not properly represented and held there was a direct adverse relationship between the taxpayer and her attorney resulting in a conflict of interest. Id. at 648. Accordingly, for Wilson v. Commissioner, supra to apply we would have to find that there was a conflict and that the estate was not properly represented. Even if it were shown that Mr. Harkavy had a conflict of interest, that showing, by itself, would not require the vacating or disregarding of the agreed decision document.

The Supreme Court in United States v. Armour & Co., 402 U.S. 673, 681-682 (1971) made the following observation concerning consent decrees:

> Consent decrees are entered into by parties to a case after careful negotiation has produced agreement on their precise terms. The parties waive their right to litigate the issues involved in the case and thus save themselves the time, expense, and inevitable risk of litigation. Naturally, the agreement reached normally embodies a compromise; in exchange for the saving of cost and elimination of risk, the parties each give up something they might have won had they proceeded with the litigation. Thus the decree itself cannot be said to have a purpose; rather the parties have purposes, generally opposed to each other, and the resultant decree embodies as much of those opposing purposes as the respective parties have the bargaining power and skill to achieve. For these reasons, the scope of a consent decree must be discerned within its four corners, and not by reference to what might

satisfy the purposes of one of the parties to it. * * * [Fn. ref. omitted.]

Moreover, "a compromise is a contract and thus is a proper subject of judicial interpretation as to its meaning, in the light of the language used and the circumstances surrounding its execution." Robbins Tire & Rubber Co. v. Commissioner, 52 T.C. 420, 435-436 (1969) (and cases cited therein).

The estate argues that if permitted to proceed to trial it could show that the $929,350 in payments (25 percent of which was conceded by respondent in the settlement) were really "disguised capital contributions to the partnership" and not subject to the estate or gift tax. The estate further alleges that if Mr. Harkavy was an "independent counsel" he would have advised the estate of several legal positions that might have resulted in the estate's complete success on the $929,350 issue.

At the time the executor agreed to the settlement with respondent, she was confronted with the following factors: (1) Her attorney (Mr. Harkavy) advised that the trial Judge had expressed a negative view of the estate's position; (2) the estate's accountant was being called as a favorable witness for respondent; (3) Mrs. Peterson contacted her own accountant but he would not provide support for the estate's position; and (4) Mr. Harkavy's doubts about the estate's position and chances of success.

After the settlement, the estate, under the guidance of a new attorney, wishes to advance a theory that the $929,350 was a nontaxable capital contribution--a theory that was not advanced, prior to the settlement, on the estate tax return, by the estate's accountant or by the estate's attorney. The estate, on brief, has also provided several legal theories that it believes show it would be successful if the agreed decision were vacated and it were allowed to proceed to trial.

In terms of a judgment entered by consent of the parties, "the parties are held to their agreement without regard to whether the judgment is correct on the merits." Stamm Intl. Corp. v. Commissioner, 90 T.C. 315, 322 (and cases cited therein). We note that in Stamm this Court enforced a settlement of the issues in which the amount of tax had not yet been calculated or reduced to a decision document. In that case, the Government sought to be relieved from the settlement agreement because of its unilateral error about the amount of tax resulting from the settlement agreement. In holding that the Government would not be relieved from its agreement, we explained that the standards for vacating a settlement agreement are "akin to those involved in vacating a judgment entered by consent." Id. at 322; see also Quinones v. Commissioner, T.C. Memo. 1988-269. (The Government was not relieved from its stipulated decision even though it was believed by the Government that it

had charged the wrong person with certain illegal income.)

Accordingly, the merits of the estate's position (whether or not it was advanced prior to the settlement) are not a dispositive consideration in attempting to decide whether we should grant the estate's motions to vacate the decisions that have been entered in accord with the parties' agreement.

Generally, this Court has not set aside a decision entered by the parties' consent "Absent a showing of lack of formal consent, fraud, mistake, or some similar ground". Dorchester Indus. Inc. v. Commissioner, 108 T.C. 320, 335 (1977).

Assuming arguendo that there was a conflict of interest connected with Mr. Harkavy's representation of the estate, in order to vacate the parties' agreed decisions we would also have to find that the estate was not properly represented. We have carefully considered the testimony of Mr. Harkavy, Mr. Klinghoffer, Mrs. Peterson, and the other individuals involved, and there is no credible evidence that Mr. Harkavy failed to properly represent the estate. In addition, there is no evidence that Mr. Harkavy's employment by IRS was related to or had any effect upon his representation of the estate or that it deterred him from making any of the arguments that the estate wishes to raise for the first time now. This case is distinguishable from Wilson v. Commissioner, supra, where the Court of Appeals for the Second Circuit found it probable that independent counsel would

have done something differently.  Accordingly, there is no compelling reason to vacate the agreed decisions that have already been accepted and entered by this Court.

To reflect the foregoing,

<u>An order will be issued denying the estate's motions to vacate.</u>