IMPRISONED CITIZENS UNION, et al.,

v.

Milton SHAPP, et al.

Civil Action No. 70–3054.

United States District Court,
E.D. Pennsylvania.

Dec. 9, 1996.

Stephan Presser, American Liberties Foundation, Philadelphia, PA, for Plaintiff.

Francis R. Filipi, Office of Attorney General (PA), Harrisburg, PA, for Defendants.

### MEMORANDUM

DuBOIS, District Judge.

## I. BACKGROUND

Between 1970 and 1971 four related cases challenging the constitutionality of conditions and policies at a number of Pennsylvania State Correctional Institutions were filed in this Court. On May 22, 1978, after those

suits were consolidated and a plaintiff class certified, then—Chief Judge Joseph S. Lord, III approved a Consent Decree settling the majority of issues raised. Judge Lord addressed the remaining issues in subsequent Opinions.

A motion for the issuance of an order to show cause and for contempt judgment was filed by plaintiffs in 1980. On December 30, 1980, with the assistance of United States Magistrate Judge William F. Hall, the parties stipulated to the dismissal of the outstanding allegations of contempt. With the further assistance of Magistrate Judge Hall, the 1980 Stipulation was amended by an agreement of the parties, approved by Judge Lord on May 11, 1983. Since 1983 a number of motions alleging violations of the Consent Decree have been filed with and, adjudicated by, this Court.

There are a number of motions presently pending before this Court,[1] each raising one or more of the following four procedural issues:

1) the scope of the plaintiff class;

2) whether individual violations of the Consent Decree may be remedied by the Court;

3) whether *pro se* submissions may be considered by the Court; and

4) whether inmates must exhaust their available administrative remedies before petitioning this Court for relief.

These issues are the subject of this Memorandum. Applying the conclusions set forth in this Memorandum, the Court will rule on each pending motion by separate Order.

## II. THE LEGAL FRAMEWORK FOR THE INTERPRETATION OF CONSENT DECREES

In 1971, the Supreme Court decided *United States v. Armour & Co.*, 402 U.S. 673, 91 S.Ct. 1752, 29 L.Ed.2d 256 (1971). Writing for the Court, Justice Marshall set forth the basic framework for the interpretation of consent decrees. He wrote:

> Consent decrees are entered into by parties to a case after careful negotiation has produced agreement on their precise terms. The parties waive their right to litigate the issues involved in the case.... Naturally, the agreement reached normally embodies a compromise.... Thus the decree itself cannot be said to have a purpose; rather the parties have purposes, generally opposed to each other, and the resultant decree embodies as much of those opposing purposes as the respective parties have the bargaining power and skill to achieve. For these reasons, the scope of a consent decree must be discerned within its four corners, and not by reference to what might satisfy the purposes of one of the parties to it. *Id.* at 681–82, 91 S.Ct. at 1757 (footnote omitted).

The Third Circuit has summarized the basic principles of *Armour* in the following manner: "Although consent decrees are judi-

1. Currently pending are the following motions: Motions of Blackiston, et al, to Enforce Judgment (Document Nos. 503 and 506); Motion of Blackiston, et al, for Evidentiary Hearing (Document No. 524); Motion of Fontroy, et al, to Vacate Judgment (Document No. 499); Motion of Fontroy, et al for Evidentiary Hearing (Document No. 525); Motion of Edward Govan for Contempt of Court (Document No. 508); Motion of Blackiston, et al, for Appointment of Counsel (Document No. 516); Motion of Fontroy, et al for Speedy Disposition (Document No. 538); Motion of Spencer Dobson and James Hardwick for Contempt of Court Proceedings (Document No. 554); Petition for Mandamus filed by Brightwell, Blackiston, et al (Document No. 560); Motion of Charles D. Zehring, Jr., for Appointment of Counsel (Document No. 561); Motion of Zehring to Proceed *In Forma Pauperis* (Document No. 562); Motion of Zehring for Order to Show Cause and For TRO (Document No. 563); Mo-

tions of Raymond J. Stanton to Find Defendants in Contempt (Document Nos. 586 and 589); Motion of Raymond J. Stanton for Leave to Proceed *In Forma Pauperis* (Document No. 588); Motion of Frank St. Clair, et al, for Sanctions, Injunctive and Temporary Relief (Document No. 590); Application to Proceed *In Forma Pauperis* of John Boski (Document No. 591); Application to Proceed *In Forma Pauperis* of Frank St. Clair (Document No. 592); Plaintiffs' Motion to Reconsider and Reverse the Court's Order of 1/18/95 Excluding Individuals Incarcerated at SCI–Camp Hill from the Class Covered by this Litigation; Motion of Raymond J. Stanton for Relevant Witnesses (Document No. 599); Motion of Raymond J. Stanton to "Dismiss the Respondents Both Responds" and "to Further Remove Attorney Stefan R. Presser" (Document No. 617); Motion of Gerald Mayo, et al, for Contempt of Court and Temporary Restraining Order (Document No. 624); and related Motions.

cial acts, they have many of the attributes of contracts voluntarily undertaken, and are construed according to traditional precepts of contract construction." *Fox v. United States Dep't of Housing and Urban Development, et al.,* 680 F.2d 315, 319 (3rd Cir.1982) (citations omitted). In interpreting the *Imprisoned Citizens Union* Consent Decree this Court has always followed the dictates of *Armour* and will continue to do so. *See Imprisoned Citizens Union v. Shapp,* CA No. 70–354, slip op. at 5, 6, 12, 29 (E.D.Pa. Nov. 25, 1987).

## III. JURISDICTION

In 1988 Judge Lord noted that "[u]nder the terms of the Consent Decree, I have retained jurisdiction over it and proceedings have continued." *Imprisoned Citizens Union v. Shapp,* 1988 WL 59270 (E.D.Pa. June 8, 1988). Under § XXVII of the Consent Decree this Court continues to retain jurisdiction over both this lawsuit and the Consent Decree. Consent Decree, at 17 ("[T]he Court retains jurisdiction of this action. . . .").

Furthermore, § XIX of the Consent Decree preserves plaintiffs' right to bring certain types of complaints before this Court. In reference to defendants' right to alter administrative remedies, § XIX states that "plaintiffs reserve their right to contest in this Court any such amendment, suspension, alteration or modification of the provisions of this Consent Decree." Consent Decree, at 14. Continuing, that section provides that "[p]laintiffs also reserve the right to contest in this Court, at any time, by any appropriate legal proceeding, any institution or system wide pattern of failure or refusal by defendants or their agents or employees to follow the provisions of this Consent Decree." *Id.* at 15.

## IV. DISCUSSION

### A. The Scope of the Plaintiff Class

A number of the pending motions have been filed by inmates confined at state correctional institutions which defendants argue are not covered by the Consent Decree. Defendants assert that only inmates in the institutions included in the plaintiff class—which defendants assert includes only State Correctional Institution ("SCI")—Graterford, SCI–Dallas, SCI–Huntingdon, SCI–Muncy, SCI–Rockview and SCI–Pittsburgh—have any rights under the Consent Decree. The inmates confined in other state correctional institutions argue that the coverage of the Consent Decree was expanded when the Decree was modified in 1983. The SCI–Camp Hill inmates also argue that the language of § V of the Consent Decree includes inmates at institutions other than the six named in the class certification Order.

Judge Lord's October 20, 1972 Order certifying the plaintiff class clearly limits membership in the class to those inmates confined at SCI–Graterford, SCI–Dallas, SCI–Huntingdon, SCI–Muncy, SCI–Rockview and SCI–Pittsburgh. That Order reads, in its entirety, as follows:

> AND NOW, to wit, this 20th day of October, 1972, it is hereby ordered that Plaintiffs' Motion that the instant suit be maintained as a Class Action on behalf of themselves and all other persons who are now or will be incarcerated in the Pennsylvania State Correctional Institutions at Graterford, Dallas, Huntingdon, Muncy, Rockview and Pittsburgh is hereby granted.

The Court concludes that § V of the Consent Decree does not expand the plaintiff class as argued by the inmates at SCI–Camp Hill. That provision, entitled "Compliance With Administrative Directives," reads as follows:

> Defendants shall comply with the regulations of the Bureau of Correction (hereinafter the "Administrative Directives") and the amendments and additions thereto.

> Defendants shall expend their best efforts to assure compliance with this Consent Decree and with the Administrative Directives and the amendments and additions thereto by all institutional staff members, and all other persons subject to defendants' jurisdiction.

Section V does nothing more than require defendants to comply with the Consent Decree and the regulations of the

Bureau of Correction.[2]. The fact that the Bureau was required to comply with the regulations with respect to inmates at the two other correctional facilities in operation at the time, SCI–Camp Hill and Regional Correctional Facility at Greensburg, is of no significance in determining the scope of the plaintiff class. Inmates at the latter institutions have the right to seek redress for violations of the regulations in an appropriate court. Inmates who are members of the plaintiff class may enforce such rights in this Court upon compliance with all of the requirements of the Consent Decree.[3]

There are no other provisions of the Consent Decree which even arguably affect the composition of the plaintiff class. Thus, unless the scope of the plaintiff class was altered at some time after its certification, the class is limited to the six institutions named in the October 20, 1972 Order.

The argument that the plaintiff class was expanded by the 1983 Report and Recommendation of Magistrate Judge Hall is without merit. Magistrate Judge Hall expressly noted in the Report and Recommendation that after Judge Lord consolidated the original four cases, "a class was certified which

consisted of all inmates then confined and all inmates to be confined in the future in the state correctional institutions at Dallas, Graterford, Huntingdon, Muncy, Pittsburgh, and Rockview." R & R, at 1. The Magistrate Judge did not recommend expansion of the class, and Judge Lord approved the 1983 Report and Recommendation in its entirety—including its definition of the plaintiff class as limited to those six institutions. *Imprisoned Citizens Union v. Shapp,* CA No. 70–3054 (E.D.Pa. May 11, 1983) (unpublished Order).

The inmates who filed motions have not specified the part or parts of the 1983 Report and Recommendation on which they rely in support of their position. There is, however, only one sentence in the Report and Recommendation which makes references to "all state correctional institutions," and it is inapposite. That sentence reads as follows: "The directive establishing the Consolidated [Inmate Grievance] System will apply to all state correctional institutions (and state regional correctional facilities and community service centers)." R & R, at 4. The statement clearly applies to the directive which established a new internal complaint system

---

**2.** The Bureau of Correction has been renamed the Department of Corrections.

**3.** On behalf of the Camp Hill inmates, class counsel argues in Plaintiff's Motion To Reconsider And Reverse The Court's Order Of January 18, 1995 Excluding Individuals Incarcerated At SCI–Camp Hill From The Class Covered By This Litigation (Document No. 600) that the Notice of Proposed Settlement, signed by Judge Lord, included the following salutation: "To all Residents at the State Correctional Institutions at Graterford, Muncy, Rockview, Huntingdon, Dallas, *Camp Hill,* and Pittsburgh." Notice of Proposed Settlement, at 1 (emphasis added). The exact date the Notice was issued is not recorded in the docket, although the Notice required the filing of objections by April 5, 1976. Notice of Proposed Settlement, at 2.

Class counsel argues that Judge Lord would not have provided notice to inmates confined at SCI–Camp Hill if he did not believe them to be covered by the Consent Decree. As support for this position class counsel points to the fact that Judge Lord provided notice to the inmates at SCI–Camp Hill but not to the inmates at the only other correctional institution operated by the De-

partment of Corrections in 1975, Regional Correctional Facility at Greensburg.

The short answer to this argument on behalf of the Camp Hill inmates is that notice of a class action settlement addressed to persons not members of the class cannot serve as the basis for including them in the class. The Court finds no basis in the record for concluding that the class includes inmates at SCI–Camp Hill. Moreover, as argued by defense counsel, plaintiffs' Motion is time-barred under Federal Rule of Civil Procedure 60(b)(3), as it was filed on June 13, 1996, well in excess of a year from the entry date of this Court's Order of January 18, 1995 in which the Court ruled that inmates at SCI–Camp Hill were not members of the plaintiff class.

Finally, there was a reason for notifying inmates at SCI–Camp Hill of the settlement—inmates at that institution were regularly transferred to and from the six institutions whose inmates are included in the plaintiff class. In 1975 it was much less likely for prisoners at the Regional Correctional Facility at Greensburg to be transferred to one of the state correctional institutions. *See* Defendant's Memorandum of Law in Opposition to Plaintiffs' Motion to Reconsider the Court's January 18, 1995, Order, at 3 n.

in all state correctional institutions. Magistrate Judge Hall noted in the Report and Recommendation nothing more than the fact that the directive would apply to all state correctional institutions; his statement does not apply to the composition of the plaintiff class.

Furthermore, in two rulings issued ten years apart Judge Lord left no doubt that the plaintiff class is limited to the six state correctional institutions named in the class certification Order. On June 7, 1978 Judge Lord wrote that "[p]laintiffs represent a class comprising all persons who are now or will be incarcerated in the Pennsylvania State Correctional Institutions at Graterford, Dallas, Huntingdon, Muncy, Rockview and Pittsburgh." *Imprisoned Citizens Union v. Shapp,* 451 F.Supp. 893, 894 (E.D.Pa.1978). Ten years later, in a Memorandum issued on June 8, 1988, Judge Lord considered an attorney's fee petition filed by one of plaintiffs' attorneys. In ruling on that petition, Judge Lord wrote that "the plaintiff class compris[es] prisoners *at several* Pennsylvania Correctional Institutions...." *Imprisoned Citizens Union v. Shapp,* 1988 WL 59270, *1 (E.D.Pa. June 8, 1988) (emphasis added). Although Judge Lord did not specify the institutions to which he referred in that Memorandum, the words "at several" make it clear that the plaintiff class to which he referred was smaller than the entire inmate population of Pennsylvania's correctional institutions.

Although not argued by movants or class counsel, language used by Judge Lord in his June 18, 1979 Opinion, standing alone, might lend support to the contention that the plaintiff class includes inmates at institutions other than the six listed in the class certification Order. On June 18, 1979, Judge Lord wrote that "On October 20, 1972 I certified a class consisting of the named plaintiffs and 'all other persons who are now or will be incarcerated in the Pennsylvania State Correctional Institutions....'" *Imprisoned Citizens Union v. Shapp,* 473 F.Supp. 1017, 1019 (E.D.Pa.1979) (quoting the Order that certified the class). Later in that Opinion, Judge Lord addressed the size of the plaintiff class as part of his discussion of the award of attorney's fees to class counsel, stating that "[b]ecause plaintiff class consisted of all inmates present and future, of the Commonwealth's prison system, the number of persons who have benefited from Mr. Levine's efforts in this action is large." *Id.* at 1027. However, Judge Lord's June 18, 1979 Opinion does not stand alone, and the Court concludes that the Opinion did not expand the size of the plaintiff class.

Judge Lord's reference to the class certification Order in his Opinion of June 18, 1979 omitted the limiting language of the Order. Had the omitted language been included, that sentence, which is quoted above, would have read as follows: On October 20, 1972 I certified a class consisting of the named plaintiffs and "all other persons who are now or will be incarcerated in the Pennsylvania State Correctional Institutions *at Graterford, Dallas, Huntingdon, Muncy, Rockview and Pittsburgh....*" (language omitted in June 18, 1979 Opinion emphasized). Furthermore, as was discussed above, both before and after the June 18, 1979 Opinion Judge Lord noted in other *Imprisoned Citizens Union* related documents that the plaintiff class consisted of only those inmates incarcerated at the six named institutions. *See supra* 338–339. In sum, the Court does not find that the plaintiff class was expanded by the June 18, 1979 Opinion in the face of the otherwise consistent limitation of the class throughout the long history of this litigation to inmates imprisoned in one of the six state correctional institutions named in the original class certification Order.

Accordingly, the Court concludes that the plaintiff class is limited to inmates confined at SCI–Graterford, SCI–Dallas, SCI–Huntingdon, SCI–Muncy, SCI–Pittsburgh and SCI–Rockview when the class was certified or at any time thereafter.[4] The Consent

3 (discussing the Bureau of Correction's 1975 prisoner transfer policy).

4. Class Counsel argues in Plaintiff Class Counsel's Response To Motions Filed by Blackiston,

Brightwell, Nigro, Jacobs and Fontroy (Document No. 515), that Camp Hill prisoners should be allowed to enforce the Consent Decree to avoid the injustice that would result if the institution at which an inmate is confined will deter-

Decree applies to those inmates only, not to the entire state correctional system.

## B. Only Allegations of Institution or System Wide Violations of The Consent Decree May Be Brought Before This Court

■ Defendants assert that only allegations of institution or system wide violations of the Consent Decree may be considered by the Court. None of the inmates who filed the pending motions take the position that there is no such requirement. However, a number of the motions allege individual, not institution or system wide, violations of the Consent Decree.

The Consent Decree expressly provides for the consideration of institution or system wide violations of the Consent Decree by this Court. Section XIX of the Consent Decree states that "[p]laintiffs also reserve the right to contest in this Court, at any time, by any appropriate legal proceeding, any *institution or system wide pattern* of failure or refusal by defendants or their agents or employees to follow the provisions of this Consent Decree." Consent Decree, at 15 (emphasis added). Although that language does not necessarily limit this Court's jurisdiction to such violations of the Consent Decree, § XXIII creates such a limitation.

Section XXIII states that "This Decree shall not create a private cause of action in any individual against any of the defendants. *Nor, except as provided in section XIX above, shall this Decree provide a basis for contempt proceedings." Id.* at 16 (emphasis added). The only bases for a contempt proceeding provided by § XIX are institution or system wide violations of the Consent Decree. Reading §§ XIX and XXIII together, it is clear that alleged violations of the Consent Decree that are not system or institution wide may not be brought before this Court. This Court's prior holdings are consistent with this interpretation of the Consent Decree.

The requirement of the Consent Decree that contempt actions could only be brought for institution or system wide violations of the Decree was also addressed by Magistrate Judge Hall in his 1983 Report and Recommendation. In his Memorandum approving the Report and Recommendation, after recounting the history of the Consent Decree, Judge Lord noted that the Court had been inundated with complaints of violations of the Consent Decree. *Imprisoned Citizens Union v. Shapp*, CA No. 70–3054, slip op. at 1 (E.D.Pa. May 11, 1983). Concluding that many of the complaints were not properly before the Court, Judge Lord stated that others "may well have been either institution-wide or state-wide and therefore in violation of the Consent Decree's state-wide reach." *Id.*

This Court most recently considered the validity of the institution or system wide violation requirement in 1987. Judge Lord stressed that requirement in his 1987 Opinion, reiterating "the parties' agreement that individual violations of the Consent Decree will not, by themselves, be actionable in contempt proceedings." *Imprisoned Citizens Union v. Shapp*, CA No. 70–3054, slip op. at 6 (E.D.Pa. Nov. 25, 1987). Continuing, Judge Lord cited the Consent Decree and the 1980 Stipulation for the proposition that "the only basis for a judgment of contempt shall be an 'institution or system wide pattern of failure or refusal by defendants or their agents or employees to follow the provisions of this Consent Decree.'" *Id.* at 6–7 (quoting Consent Decree, at 15 and citing Consent Decree, at §§ XIX and XXIII; 1980 Stipulation, at 14).

Accordingly, the Court will not consider any contempt motions alleging violations of the Consent Decree that are not institution or system wide.

## C. The Court Will Not Consider *Pro Se* Filings

■ Section XIX of the Consent Decree states that "[p]laintiffs also reserve the right

---

mine his rights. However, counsel does not suggest any reason why the Camp Hill inmates' right to file civil rights lawsuits does not adequately protect those inmates. As Judge Lord stated in 1987, "the Consent Decree makes clear that indi-

vidual violations are not to be the basis of a contempt judgment. Of course, that stricture does not preclude an inmate from seeking redress in the appropriate court for any violation of his individual rights." *See Imprisoned Citizens*

to contest in this Court, at any time, *by any appropriate legal proceeding,* any institution or system wide pattern of failure or refusal by defendants or their agents or employees to follow the provisions of this Consent Decree." Consent Decree, at 15 (emphasis added). Although the phrase "[p]laintiffs also reserve" evidences the fact that this right is reserved by the members of the plaintiff class, that phrase does not grant individual members the right to file *pro se* claims of violations of the Consent Decree in this Court. Rather, members of the class may only initiate "any appropriate legal proceeding" if they seek to remedy such violations. And, it is clear that the only appropriate legal proceeding in a class action is one initiated by class counsel.

The cases addressing the alleged right of a class member to proceed *pro se* rather than through class counsel conclude that such action is inappropriate. In 1988 the Fifth Circuit stated that "[i]ndividual members of the class ... may assert any equitable or declaratory claims they have, but they must do so by urging further action through the class representative and attorney, including contempt proceedings or by intervention in the class action." *Gillespie v. Crawford,* 858 F.2d 1101, 1103 (5th Cir.1988); *see also Long v. Collins,* 917 F.2d 3 (5th Cir.1990). Citing *Long,* the Tenth Circuit held in *McNeil v. Guthrie,* 945 F.2d 1163 (10th Cir.1991), that "individual prisoners lack standing to individually litigate matters relating to [a] class action." *Id.* at 1166 (citing *Long,* 917 F.2d at 4–5 (5th Cir.1990) and *Goff v. Menke,* 672 F.2d 702, 704 (8th Cir.1982)).

The Eighth Circuit has also addressed this question, concluding that the district court had abused its equitable power by granting class-wide relief upon the filing of a *pro se* motion to enforce a preliminary injunction that had been issued in another suit. *Goff,* 672 F.2d at 704. In so holding the Eighth

Circuit explained that "[f]or reasons of law as well as judicial economy ... to the extent that injunctive relief was sought, Goff [the prisoner proceeding *pro se* ] should have been required to proceed through the class representative or through intervention." *Id.*

The rule of the aforementioned cases is designed to allow a court to effectively administer justice in a class action suit, without being inundated with filings from each individual member of the class—a problem illustrated by the current posture of this litigation. Class counsel has notified the Court that he will not adopt the vast majority of the *pro se* motions pending before this Court because he believes that most of those motions are either procedurally barred or without merit. As the class members' advocate, class counsel is duty-bound to aggressively pursue any allegations of institution or system wide violations of the Consent Decree that he believes are meritorious. Class counsel has done so in the past, and the Court has been provided with no reason to believe that he will not continue to do so. The requirements of judicial economy and the logic of the aforementioned cases compel the Court to conclude that *pro se* requests for enforcement of the Consent Decree should not be considered.

Furthermore, the Court's ruling on this issue is consistent with the prior rulings of other Judges on this Court. In at least six prior instances the Court has denied motions because "plaintiffs ha[d] not enlisted the assistance of class counsel in filing th[e] motion[s] and, therefore, ha[d] not complied with the consent decree's procedural requirements for the prosecution of violations...." *Imprisoned Citizens Union v. Shapp,* CA No. 70–3054 (E.D.Pa. Oct. 16, 1992) (unpublished Order) (Dalzell, J.).[5]

*Union v. Shapp,* CA No. 70–3054, slip op. at 20 n. 10 (E.D.Pa. November 25, 1987).

**5.** The six instances referred to in the text are docketed as documents 457, 465, 467, 471, 472, and 482. Document 457 is an order issued by Judge Fullam on behalf of Senior Judge Lord, in which Judge Fullam denied a *pro se* Motion for Contempt "without prejudice to the right of

counsel for the plaintiff class to renew such petition should counsel consider renewal appropriate" because "it appear[ed] that movants' claims [we]re *cognizable in the above captioned cases, if at all, only as part of a motion for contempt filed by class counsel* and alleging an institution or system wide violation of the ICU consent decrees." Documents 465, 467, 471, 472, and 482 are similar orders in which Judge Dalzell denied

Accordingly, this Court holds that all allegations of institution or system wide violations of the Consent Decree must be made in Motions for Contempt of the Consent Decree filed by class counsel.

## D. Inmates Must Exhaust Their Administrative Remedies Before The Court Will Consider Alleged Violations of the Consent Decree

Defendants assert that inmates must exhaust their administrative remedies before seeking relief in this Court. Although it does not appear that any of the inmates who filed the pending motions take the position that there is no such requirement, a number of the motions do not provide evidence of exhaustion. Furthermore, defendants argue that a number of the movants have not exhausted their administrative remedies.[6]

In 1987, Judge Lord wrote that "pursuant to the parties' agreement and my order of May 11, 1983 approving their Amendment to the Stipulation for Dismissal, plaintiffs must *exhaust* the inmate grievance procedure established by that stipulation before presenting any claim to the court as part of a contempt proceeding." *Imprisoned Citizens Union v. Shapp*, CA No. 70–3054, slip op. at 6 (E.D.Pa. Nov. 25, 1987) (emphasis added). The Order to which Judge Lord referred was quite explicit. In adopting the 1983 Report and Recommendation, Judge Lord

> ordered that ... Pursuant to the terms of settlement, when the administrative proce-

dure for inmate grievances described by Section I.B. of the Stipulation is adopted, members of the plaintiff-class must *exhaust* that procedure before filing with the court any allegations of violations of the Consent Decree and/or any allegations of contempt. *Imprisoned Citizens Union v. Shapp*, CA No. 70–3054 (E.D.Pa. May 11, 1983) (unpublished Order) (emphasis altered).

Accordingly, the Court finds that any Motions for Contempt of the Consent Decree may be filed by class counsel only after inmates have exhausted their administrative remedies with respect to the incidents underlying the motion.[7]

## V. Conclusion

For the reasons set forth above, the Court holds that it will consider a Motion for Contempt of the Consent Decree only if the Motion:

1) is filed on behalf of inmates imprisoned at SCI–Graterford, SCI–Dallas, SCI–Huntingdon, SCI–Muncy, SCI–Pittsburgh or SCI–Rockview at the time the class was certified or at any time thereafter;

2) alleges an institution or system wide violation of the Consent Decree;

3) is filed by class counsel; and

4) is filed after inmates have exhausted their administrative remedies with respect to the incidents underlying the motion.

---

various *pro se* motions because the movants had not acted through class counsel.

**6.** Some of the Camp Hill inmates have suggested that there should be a futility exception to the exhaustion requirement. *See* Motion to Vacate Judgment (Document No. 499). Because this Court has held that those inmates are not members of the plaintiff class, and therefore not parties to the Consent Decree, the Court need not reach this question.

**7.** The administrative remedies in question are contained in the Commonwealth of Pennsylvania's Department of Corrections' Inmate Handbook. In particular, two Policy Statements that spell out specific appeals processes are most often implicated by the exhaustion requirement: DC–ADM 801 (Inmate Disciplinary and Restricted Housing Procedures) and DC–ADM 804 (Consolidated Inmate Grievance Review System). Copies of these two Policy Statements are attached as appendices to this Memorandum.

**POLICY STATEMENT**
Commonwealth of Pennsylvania • Department of Corrections

| Policy Subject: | | Policy Number: |
|---|---|---|
| Consolidated Inmate Grievance Review System | | DC-ADM 804 |

| Date of Issue: | Authority: | Effective Date: |
|---|---|---|
| July 20. 1994 | Joseph D. Lehman Commissioner | Oct. 20. 1994 |

## I. Authority

The authority of the Commissioner of Corrections to direct the operation of the Department of Corrections is established by Sections 201, 206, 506, and 901(b) of the Administrative Code of 1929. Act of April 9, 1929, P.L. 177, 175, as amended.

## II. Purpose

A consistently applied system of sanctions in response to inmate violations of Department of Corrections rules and regulations is established to ensure the safe and orderly operation of institutions and Community Corrections Facilities.

## III. Applicability

This policy shall be applicable to all inmates and staff in all Department of Corrections' facilities and Community Corrections Centers.

## IV. Definitions

For the purpose of this policy, the following definitions shall apply:

A. Central Office Review Committee (CORC)—A panel of at least three (3) Central Office staff members appointed by the Commissioner, including an attorney from the Office of Chief Counsel, which conducts final reviews of institution grievance and misconduct appeals.

B. Disciplinary Custody—The maximum restrictive status of confinement to which inmates guilty of Class I misconducts may be committed. Inmates shall be placed in disciplinary custody status for periods no longer than ninety (90) days per misconduct report.

C. Hearing Examiner—An employe of the Department of Corrections Central Office who conducts inmate misconducts hearings. The hearing examiner reviews evidence, determines relevance of witnesses, interviews witnesses, determines guilt or innocence and imposes sanctions consistent with this policy.

D. Misconduct—Any violation of Department of Corrections Rules, Regulations or Policies as outlined in Section VI of this policy.

E. Pre–Hearing Confinement—A temporary administrative status of confinement in the inmate's general population cell or the RHU pending the outcome of a misconduct hearing.

F. Program Review Committee—A panel of three (3) members consisting of the two (2) Deputy Superintendents, Inmate Program Manger, or Unit Manager. The Superintendent may designate appropriate substitutes. The Program Review Committee conducts Administrative Custody hearings, thirty (30) day reviews, makes decisions about continued confinement in the RHU/SMU, and hears all appeals of misconducts.

G. Restricted Housing Unit—An area or group of cells for inmates assigned to disciplinary or administrative custody status.

H.  Special Management Unit—(SMU) A special unit within designated Department of Corrections institutions designated to safely and humanely handle inmates whose behavior presents a serious threat to the safety and security of the facility, staff, other inmates, or him or herself.

I.  Mental Health Cases—Inmates who have a mental health stability score of 3 or above, are listed on the institution's Psychiatric Review Team roster, or in the opinion of the staff, may be suffering from a serious mental illness.

## V.  Policy

It is the policy of the Department of Corrections to operate a disciplinary process which provides clear notice of prohibited behavior, outlines a fundamentally fair hearing process, and establishes consistent sanctions for violations of Department of Corrections rules and regulations.

## VI.  Procedure

All inmates under the jurisdiction of the Department of Corrections are expected to follow the rules and regulations. This section provides a list of prohibited behavior which can result in misconduct charges, the misconduct hearing procedures, and the appeal procedures.

## A.  Misconduct Charges

### Class I Charges Category A

1.  Violation of the PA Crimes Code (must be specified)

    1.a.  Assault—Including any aggressive physical contact with a potential for injury towards an employe.

| | | | |
|---|---|---|---|
| 1.b. | Murder | 1.i. | Kidnapping |
| 1.c. | Rape | 1.j. | Aggravated Assault |
| 1.d. | Arson | 1.k. | Voluntary Manslaughter |
| 1.e. | Riot | 1.l. | Extortion by Threat of Violence |
| 1.f. | Escape | 1.m. | Involuntary Deviate Sexual Intercourse |
| 1.g. | Robbery | 1.n. | Threatening an Employe or Their Family with Bodily Harm |
| 1.h. | Burglary | | |

### Class I Charges Category B

2.  Fighting.

3.  Threatening another person.

4.  Engaging in sexual acts with others, or sodomy.

5.  Wearing a disguise or mask.

6.  Failure to report an arrest for any violation of the Pennsylvania Crimes Code (Community Corrections Centers only).

7.  Refusing to obey an order.

8.  Possession of contraband including money, implements of escape, unprescribed drugs or drugs which are prescribed, but the inmate is not authorized to possess, drug paraphernalia, poisons, intoxicants, materials used for fermentation, property of another, weapons or other items which in the hands of an inmate present a threat to self, others or to the security of the institution. When an inmate is charged under this section with possession of an item of contraband which is a weapon or item which in his hands presents a threat to others or to the security of the institution, and the item also has a legitimate use in the area discovered, creditable evidence that the item has been used only for the legitimate purpose shall be considered to mitigate the misconduct to a Class II.

9.  Possession, or use of a dangerous or controlled substance.

10. Possession, or use, of intoxicating beverages.

11. Extortion, or blackmail.

12. Any violation of the Pennsylvania Crimes Code not in Category I (must be specified).

*Class I Charges Category C*

13. Tattooing, or other forms of self mutilation.

14. Destroying, altering, tampering with, or damaging property.

15. Indecent exposure.

16. Engaging in, or encouraging unauthorized group activity.

17. Refusing to work, or encouraging others to refuse to work.

18. Breaking restriction or quarantine.

19. Gambling or conducting a gambling operation.

20. Unauthorized use of the mail or telephone.

21. Possession or circulation of a petition, which is a document signed by two or more persons requesting or demanding that something happen or not happen, without the authorization of the Superintendent.

22. Using abusive or obscene language to an employee.

*Class I Charges Category D*

23. Failure to stand count or interference with count.

24. Violating a condition of a pre-release program (must be specified).

25. Violation of visiting regulations (must be specified).

26. Lying to an employe.

27. Presence in an unauthorized area.

28. Loaning or borrowing property.

29. Failure to report the presence of contraband.

*Class II Charges*

30. Body punching, or horse play.

31. Taking unauthorized food from the dining room or kitchen.

32. Failure to report to work, or unexcused absence from work.

33. Smoking where prohibited.

34. Possession of any item not authorized for retention or receipt by the inmate not specifically enumerated as Class I contraband.

35. Any violation of a rule or regulation in the Inmate Handbook not specified as a Class I misconduct charge.

B. Any attempt to commit any of the above listed charges shall constitute a misconduct of the same classification as the completed act would be.

C. **Misconduct Sanctions**

1. Misconduct sanctions shall be imposed by the hearing examiner.

2. Inmates found guilty of Class I misconduct charges may be subject to any one or more of the following sanctions:

    a. Assignment to disciplinary custody status for a period not to exceed *ninety (90) days* per misconduct report.

    b. Cell restriction for a period not to exceed thirty (30) days per misconduct report. Cell restriction is total confinement to general population cell, dorm area or cubicle, except for meals, showers, one (1) formal religious service per week, commissary, law library and one (1) specified daily exercise period. Participation in programs, school, and work are suspended.

    c. Loss of privileges for a prescribed period of time. Privileges lost must be specifically identified and should, where possible, be related to the misconduct violation.

    d. Payment of fair value for property lost or damaged of for expenses incurred as a result of the misconduct.

    e. Reprimand, warning, counselling.

    f. Suspension or removal from job.

    g. Confiscation of contraband.

    h. Revocation of pre-release status.

3. The hearing examiner may reduce the classification of any Class I misconduct

(except Category A charges) to a Class II misconduct.

4. Inmates found guilty of Class II misconduct charges are subject to one or more of the above sanctions *except* placement in the disciplinary status, cell restriction, change of custody level, and loss of pre-release status. The only permissible sanction for Class II category contraband is confiscation of the contraband.

5. Presumptive range of misconduct sanctions.

*Class I Charges Category A*

No less than 30 days disciplinary custody status

No more than 90 days disciplinary custody status

*Class I Charges Category B*

No less than 30 days cell restriction

No more than 60 days disciplinary custody status

*Class I Charges Category C*

No less than 15 days loss of privileges

No more than 15 days disciplinary custody status

*Class I Charges Category D*

No less than 15 days loss of privileges

No more than 15 days disciplinary custody status

*Class II Charges*

No less than 5 days loss of privileges

No more than 15 days loss of privileges

The hearing examiner will have the authority to impose a term which deviates from the presumptive sanctioning range (except in cases of bodily harm or injury). If the hearing examiner does vary from the presumptive range, the rationale for the exception must be documented as part of the record of the hearing.

6. Time given for misconducts involving bodily injury, and attempt to commit bodily injury, or use of a weapon will be served in its entirety. For other misconducts, the Program Review Committee may consider a release to general population upon completion of half of the sanction imposed.

The Superintendent or PRC may change an inmate from DC status to AC status only upon expiration of the DC sanction and only if proper notice and hearing procedures are provided as outlined in DC-ADM 802.

7. At any time, the Superintendent or designee may reduce the disciplinary sanction imposed on any inmate other than those with misconducts involving bodily injury, attempts to commit bodily injury or use of a weapon, based on the security needs of the institution in accordance with the "Administration of the Restricted Housing Unit" policy. When this occurs, the Superintendent shall notify the Regional Deputy Commissioner via Weekly Status Report.

8. In cases of multiple misconduct sanctions, the Superintendent may reduce the total amount of disciplinary time based upon positive adjustment by the inmate. Disciplinary time cannot be reduced beyond the longest sanction imposed per misconduct report for Category A charges or half of the longest sanction imposed for other category charges.

9. The PRC or the superintendent will have the discretion to reduce disciplinary sanctions for mental health cases.

### D. RHU Procedures for Disciplinary Custody Status Inmates

1. Disciplinary custody status inmates are housed in separate cells from general population and administrative custody status inmates.

2. Smoking in the disciplinary custody status housing area will be limited to one pack of cigarettes every two (2) weeks, to be purchased from the institution commissary. Indigent inmates may be provided with cigarettes consistent with policy 15.3.6, VI. D., Smoking in Department of Corrections Buildings and Facilities.

3. Inmates in disciplinary custody status will not have the privileges of radios, televisions, telephone calls, personal property or commissary (except cigarettes toilet articles, legal/correspon-

dence materials, and prescribed medications).

4. Visits are limited to one (1) non-contact visit per month with immediate family only. Legal visits will be permitted. In cases of emergencies, a telephone call may be approved by the Unit Manager or a Commissioned Officer.

5. Disciplinary custody status inmates will be permitted legal materials that may be contained in one (1) records center box. Any additional legal material will be stored and available upon request on an even exchange basis. A personal Bible, a Holy Koran, or equivalent religious publication is permitted.

6. Inmates will be provided access to the institution law library by requesting legal materials in accordance with Departmental policy. Other library books may be requested on a weekly basis.

7. Inmates in disciplinary custody status will be provided with an R.H.U. jumpsuit and footwear. Basic issue toilet articles will be provided on request. Two (2) pair of personal undergarments are permitted. No other personal property is permitted. Outerwear for exercise will be provided as needed.

8. Disciplinary custody status inmates will receive one (1) hour exercise per day, five (5) days per week, and shall be permitted a minimum of three (3) showers and three (3) shaves per week.

9. The Program Review Committee will interview all disciplinary custody cases every thirty (30) days.

### E. Misconduct Reports

1. Inmates charged with any of the listed violations will receive a misconduct report.

2. Content of the Misconduct Report—The misconduct report is used to give notice to the inmate of the conduct violations with which he/she has been charged and the facts upon which the charges are based. The misconduct report will be used as evidence against the inmate at the misconduct hearing.

3. Charging Staff Member—The misconduct report shall be written by a staff member who has personal knowledge of the misconduct violation or by a staff member at the direction of a person who has personal knowledge of the misconduct.

4. Time of Writing of the Misconduct Report—The misconduct report should be written the same day/shift that the charging staff member has knowledge of the incident. If not, the misconduct report must include a justification for the delay.

5. Approval by Ranking Officer on Duty—Prior to service of the misconduct report on the inmate, the report shall be reviewed and approved by the shift commander. Pre-hearing confinement not to be routine but utilized only upon approval of the shift commander based on an assessment of the incident and the need for control.

### F. Service of Misconduct Report

1. The inmate shall be personally served with the misconduct report within a reasonable time after it is written.

2. If an inmate is placed in pre-hearing confinement, the misconduct report shall be served within three (3) hours of the inmate's placement in pre-hearing confinement. If the inmate is not pled in pre-hearing confinement, notice shall be served the same day the misconduct report is written.

3. The misconduct report will, except at Community Corrections Centers, be served by someone other than the charging staff member.

4. The staff member who serves the misconduct shall record the date and time of service on the conduct report immediately prior to giving the inmate a copy of the misconduct report.

5. The Witness Request form and the Inmate Version form shall be delivered to the charged inmate with the misconduct report. The inmate must fill out the Witness Request form and submit to the block officer or Community Corrections Center staff members no later than

9:00 a.m. the next working day. The block officer shall sign the Witness Request form, give a copy to the inmate and forward the form to the hearing examiner. The inmate should bring the Inmate Version form to the hearing.

### G. Misconduct Hearing

1. Scheduling—The misconduct hearing shall be scheduled no less than twenty four (24) hours nor more than six (6) calendar days after notice of the charges is served.

2. The misconduct hearing shall be conducted by a Department of Corrections' hearing examiner.

3. Inmate Assistance

   a. The inmate shall be permitted assistance at the hearing from any staff member or any inmate in general population status. The assistant must be willing to serve.

   b. The inmate shall be permitted to meet with the assistant an appropriate period of time before the hearing.

4. Inmate Version—At the hearing, the charges will be read to the inmate. The hearing examiner will request the inmate's plea to each individual charge. The inmate may submit a written version or may orally present his or her version which shall be summarized as part of the record of the hearing.

5. Witnesses

   a. The hearing examiner may require the presence of any staff member or witness.

   b. Up to three (3) relevant witnesses, who have been properly requested, shall be permitted. One of the three witnesses may be the staff member who witnessed the misconduct violation, or the charging staff member.

      (1) Relevance—The inmate must state on the Witness Request form why the witness is relevant to the hearing. The witness must be a staff member, official volunteer, contract employee, or an inmate, unless the hearing is conducted at a Community Correc-

tions Facility, where civilian witnesses may be permitted.

      (2) Availability—If the inmate properly requests a witness who is not available at the time of the hearing, the inmate may elect to either waive the six (6) calendar days hearing requirement or to have the witness execute a written statement under oath which will be presented in lieu of live testimony. If the inmate elects to have the witness present, the hearing will be rescheduled at the earliest practical time after the witness is available.

      (3) If an inmate witness or assistant becomes disruptive at the hearing, he or she will be removed.

   c. The hearing examiner may question any witness. The charged inmate shall be permitted a reasonable opportunity to pose relevant questions for any adverse witness to respond to. The extent of questioning shall be controlled by the hearing examiner.

   d. Determinations of credibility shall be made by the hearing examiner.

   e. All testimony shall be under oath.

   f. If the inmate elects to plead guilty or waive his/her right to a hearing, no witnesses will be required.

6. Confidential Source of Information—When the misconduct report is based upon information supplied by a confidential informant, the following procedure shall be followed:

   a. An in-camera hearing (without the charged inmate present) will be conducted to determine the reliability of the informant. The informant must be established as reliable by a preponderance of evidence showing:

      (1) How, where and when the informant was in a position to observe the violation or gain personal knowledge of the violation.

      (2) What other witnesses have corroborated the informants statement and how, or how and when the informant gave reliable information in the past.

   b. The information provided by the informant, but not the identity of the

informant will be disclosed to the charged inmate during the hearing. The charged inmate will have the opportunity to respond to the facts presented in the informant's statement.

c. In cases where the information provided by the informant could by itself reveal the identity of the informant, the examiner may withhold identifying information from the charged inmate.

## H. Disposition of Charges

1. As soon as possible after hearing all evidence, but within the six (6) calendar day limit, the hearing examiner shall determine whether the inmate is guilty of the misconduct charges based upon a preponderance of the evidence, that it is more likely than not that the inmate committed the misconduct charge or charges.

2. After the decision is reached by the examiner, the inmate shall be called before the examiner to hear the decision.

3. If the inmate is found not guilty, that fact shall be recorded in writing. The inmate shall be given a copy. No rationale for the decision is required. All record of the misconduct shall be removed from the inmate's institution file and retained in a separate institution file until the inmate is released or transferred.

4. If the inmate is found guilty, a written summary of the hearing will be prepared which will include the facts relied upon by the hearing examiner to reach the decision, and the reasons for the decision. The summary shall also include findings of fact concerning the testimony of each witness presented. A copy of the written summary will be given to the inmate. The inmate shall be advised that he/she has fifteen (15) days to submit a written request for appeal to the Program Review Committee.

5. The hearing examiner may dismiss any misconduct report without prejudice, to permit recharge without determination of guilt or innocence.

## I. Appeals

1. First Level of Appeal—*Program Review Committee*

a. Any inmate who has been found guilty of a misconduct charge or charges may appeal to the Program Review Committee for initial review within fifteen (15) days of the hearing. The three (3) valid bases for an appeal to the Program Review Committee are:

(1) The procedures employed were contrary to law, this policy or the I.C.U. Consent Decree.

(2) The punishment is disproportionate to the offense. Sanctions imposed outside of the presumptive sentencing range may be appealed on this basis.

(3) The findings of fact were insufficient to support the decision.

b. No appeals from a finding of not guilty are permitted.

c. All appeals shall be in writing. Only one (1) appeal to the Program Review Committee shall be permitted in the case of each misconduct report.

d. Any inmate may seek the assistance of a staff member or an inmate in the same population status in the preparation of an appeal. The inmate appellant must sign the appeal.

e. The appeal shall include a brief statement of the facts relevant to the appeal. The text must be legible and presented in a courteous manner. The inmate may state any claims concerning alleged violations of Department Directives and Regulations or the I.C.U. Consent Decree, or other law.

f. The Program Review Committee will address each issue raised by the inmate, and may, at its discretion, consider any other matter relevant to the issues raised. The Program Review Committee is not required to address issues not raised or improperly raised by the appellant.

g. The Program Review Committee shall have the power to:

(1) Reject any appeal which does not conform to Sections a. through f. above.

(2) Uphold the hearing examiner's decision.

(3) Uphold the finding of guilt, but modify the punishment.

(4) Vacate the decision and remand back to the hearing examiner for a rehearing.

(5) Vacate the decision and the charge to permit recharge and rehearing.

(6) Dismiss the charge and prohibit recharge.

(7) The Program Review Committee may not impose a greater punishment than has been designated by the hearing examiner. The Program Review Committee will provide a brief written statement to the inmate of the reasons for its decision within five (5) working days of receipt of an appeal.

2. Second Level of Appeal—*Superintendent*

a. The inmate may appeal the decision of the Program Review Committee to the Superintendent within five (5) days of receipt of the written P.R.C. decision.

b. The Superintendent will address all issues raised by the inmate and may, at his/her discretion, consider any other matter relevant to the issues raised. He/she is not required to address issues not raised or improperly raised by the appellant.

c. The Superintendent may make any decision permitted to the Program Review Committee. The decision of the Superintendent will be in writing and will be forwarded to the inmate within three (3) working days of receipt of the appeal. Any day that the Superintendent is absent from the institution will not be included in the three (3) working days.

3. Final Appeal—*Office of Chief Counsel*

a. The inmate may appeal the decision of the Superintendent to the Office of Chief Counsel within seven (7) calendar days of receipt of the Superintendent's decision.

b. An attorney will review the issues of appeal and the complete record of the hearing and previous appeals. The attorney may respond directly to the inmate or refer the appeal to the Central Office Review Committee (CORC) for further review. A final decision will be provided to the inmate within twenty-one (21) days of receipt of the appeal to final review.

c. The attorney will address all issues properly raised by the inmate and may review any other matter relevant to the issues raised and may affirm, modify, reverse, or take other appropriate action with regard to the appeal.

**J. Waivers**

1. An inmate may voluntarily waive the hearing process outlined in this policy at any time prior to the hearing's completion. The inmate may also waive any witness requests or time limitations relating to the hearing or service of notice.

2. All waivers shall be in writing and shall be signed by the charged inmate.

**K. Inmate Refusal to Attend the Hearing**

Inmates who refuse to attend a hearing will be advised they have a right to a hearing but may waive that right. The inmate will be asked to sign the waiver.

2. If the inmate refuses to attend the hearing or sign a waiver, two (2) staff members who witnessed the refusal will sign the waiver form. The hearing will be conducted without the charged inmate present. The hearing examiner will determine guilt or innocence, and a sanction will be imposed if the inmate is found guilty.

3. The inmate may appeal the results of a hearing he/she refuses to attend in accordance with Section I above.

**L. Inmate Unable to Attend**

If the inmate is physically or mentally unable to attend or participate in a hearing, the hearing examiner shall postpone the hearing until the inmate is able to attend and participate. The decision to postpone a hearing under this section shall

be in writing and shall be made at the time the hearing would have been held.

## M.  Community Corrections

1.  Definitions

a.  Center Director–The Director of the Community Corrections Center or the authorized designee of the Director.

b.  Regional Director—The Director of the region in which a Community Corrections Center is located.

c.  Hearing Committee—The persons designated by the Center Director to conduct misconduct hearings at the Community Corrections Center.

(1) The Committee shall be impartial and shall consist of at least one staff member but no more than three staff members.

(2) The Committee shall perform the functions performed by hearing examiners as outlined in this directive.

2.  Procedures

a.  Misconduct hearings held at a Community Corrections Facility will be heard by a hearing committee.

b.  If a Community Corrections inmate is placed in pre-hearing confinement, the misconduct report shall be served within 48 hours of the inmate's placement in prehearing confinement.

c.  If a Community Correction's inmate is returned to an institution under pre-hearing confinement, the hearing will be conducted at the institution by a hearing examiner.

d.  Misconduct reports will be processed and hearings conducted as outlined in Section VI of this policy.

e.  Appeals

(1) If the inmate has been permanently returned to an institution appeals may be filed in accordance with Section 1 of this directive.

(2) Inmates remaining at a Community Corrections Facility may appeal misconduct hearings results to the Director, Community Corrections, Bureau of Community Corrections, P.O. Box 598, Camp Hill, Pennsylvania 17001–0598.

## VII.  Suspensions During an Emergency

In an extended emergency situation or extended disruption of normal institution operation, any provision or section of this policy may be suspended upon approval of the Commissioner of Corrections.

## VIII.  Rights Under this Directive

This directive sets out policy and procedure.  It does not create rights in any person nor should it be interpreted or applied in such a manner as to abridge the rights of any individual.  The directive should be interpreted to have sufficient flexibility so as to be consistent with law and to permit the accomplishment of the purpose of the directives and policies of the Department of Corrections.

## IX.  Superseded Policy and Cross–Reference

This policy supersedes DC–ADM 801 dated October 29, 1992.

*Policy Manual Cross–Reference*—DC–ADM 802.  DC–ADM 804

*ACA Cross References*—3–4214 through 3–4236, 3–4250, 3–4254, and 3–4260.

/s/  Joseph D. Lehman
Joseph D. Lehman,
Commissioner

**POLICY STATEMENT**
Commonwealth of Pennsylvania • Department of Corrections

| Policy Subject: INMATE DISCIPLINARY AND RESTRICTED HOUSING PROCEDURES (DC-ADM 801) | Policy Number: DC-ADM 801 |
|---|---|
| Date of Issue: May 20. 1994 | Authority: | Effective Date: Sept. 20. 1994 |

## I. AUTHORITY

The Authority of the Commissioner of Corrections to direct the operation of the Department of Corrections is established by Sections 201, 206, 506, and 901–B of the Administrative Code of 1929, Act of April 9, 1929, P.L. 177, No. 175, as amended.

## II. .PURPOSE

It is the purpose of this Administrative Directive to establish policy regarding the Consolidated Inmate Grievance Review System and to ensure that inmates have an avenue through which resolution of specific problems can be sought.

This directive sets forth procedures for the review of Inmate Grievances not already covered by other Administrative Directives and policies. It also provides the method through which review procedures established by other directives are to be integrated with the procedures outlined in this directive.

## III. APPLICABILITY

This policy is applicable to all employees of the Department of Corrections and all inmates under the jurisdiction of the Department of Corrections and to those individuals and groups who have business with or use the resources of the Department of Corrections.

## IV. DEFINITIONS

A. Grievance—

The formal written expression of a complaint submitted by an inmate related to a problem encountered during the course of his/her confinement.

B. Grievance Coordinator—

The Corrections Superintendent's Assistant in an institution or the Assistant to the Regional Director in Community Corrections who is responsible for the overall administration of the Inmate Grievance System in that facility/region. This includes all data collection, tracking and statistical reporting. At the direction of the Facility Manager or Community Corrections Regional Director, the Grievance Coordinator may be called upon to provide Initial Review of certain grievances.

C. Grievance Officer—

An appropriate Department Head or Management Level staff person designated by the Facility Manager or CC Regional Director to provide Initial Review of an inmate grievance arising from his/her specific area of responsibility, e.g., a Unit Manager would be assigned to provide Initial Review of a grievance from the housing unit. If the grievance arises from the Food Services Area, the Grievance Officer designated by the Facility Manager shall be the Food Services Manager, likewise, the Corrections Health Care Administrator would be the Grievance Officer for a grievance related to a Health Care issue.

D. Central Office Review Committee (CORC)—

A committee of at least three (3) Central Office staff appointed by the Commissioner of Corrections to include the Commissioner, Executive Deputy Commissioner and Chief Counsel or their designees.

With the exception of appeals from disciplinary action under DC–ADM 801 and appeals arising from Health Care or medical treatment grievances, the CORC Shall have responsibility for direct review of all Inmate Appeals for Final Review.

E. Central Office Medical Review Committee (**COMRC**)—

A committee appointed by the Commissioner to include the Director of the Bureau of Health Services and relevant Bureau staff. The COMRC shall have responsibility for direct review of grievance appeals related to Health Care and medical treatment issues.

F. Initial Review—

The first step in the formal Inmate Grievance Process for all issues except those already governed by other specified procedures (see VI E). All reviews conducted below the level of Facility Manager or Regional Director are considered initial reviews.

G. Appeal from Initial Review—

The first level of appeal of a decision rendered at Initial Review. This appeal is directed to the Facility Manager or Community Corrections Regional Director.

**An appeal of the Initial Review decision on a grievance related to a Health Care or Medical issue shall be submitted directly to the COMRC at Central Office.**

**Only issues raised at Initial Review shall be appealed.**

H. Final Review—

Upon completion of Initial Review and appeal from Initial Review, an inmate may seek Final Review from the Central Office Review Committee (**CORC**), for any issue involving continued non-compliance with Department of Corrections directives or policy, the ICU Consent Decree or other law.

## V. POLICY

A. It is the policy of the Pennsylvania Department of Corrections that every individual committed to its custody shall have access to a formal procedure—the Consolidated Inmate Grievance Review System—through which the resolution of problems or other issues of concern arising during the course of confinement may be sought. For every such issue there shall be a forum for review and an avenue of appeal, but only one.

B. Informal Resolution of Problems—All inmates are expected to attempt to resolve problems or differences with staff on an informal basis through direct contact or by sending a request slip to appropriate staff. Action taken by the inmate to resolve the situation must be indicated on the grievance form, Section B.

The Grievance Form, DC 804, Part I, is available in each Housing Unit or upon request from Unit staff. This is the proper form to be used for submission of a grievance and it should be completed according to the directions provided.

**It is required that a genuine effort be made to resolve the problem before the grievance system is used. The inmate must document these efforts in Section B of the Grievance Form. Failure to do so may result in the grievance being returned to the inmate without action. The inmate may then refile the grievance with Section B properly completed.**

C. Any inmate using the grievance system shall do so in good faith and for good cause.

No one shall be punished, retaliated against or otherwise harmed for good faith use of this grievance system.

Deliberate misuse of the grievance system may result in restricted access or disciplinary action, at the discretion of the Facility Manager.

D. It is the intent of the Department of Corrections to provide for an accelerated review of appeals of grievances related to medical issues. For this reason, the inmate is permitted to appeal a medical grievance to the Central Office Medical Review Committee for Final Review directly from Initial Review. See VI., C. 1.

E. The Inmate Grievance Review System is intended to deal with a wide range of issues, procedures or events which may be of concern to inmates. It is not meant to address incidents of an urgent or emergency nature. When faced with such an event, the inmate should contact the nearest staff member for immediate assistance.

## VI. PROCEDURES

A. Grievance shall be submitted to the Grievance Coordinator in the following manner.

1. All grievances shall be in writing and in the format provided on the forms supplied by the institution (DC–804 Part I). See Section V., B.

2. All grievances shall be presented individually. Any grievance submitted by a group of inmates will not be processed, however, if the Grievance Coordinator believes that the issue being grieved is legitimate, it will be referred to appropriate Management Staff for review.

3. Only an inmate who has been personally affected by a Department or institution action or policy shall be permitted to seek review of a grievance or appeal. The inmate grievant must sign the grievance or appeal.

4. All grievances and appeals must be presented in good faith. They shall include a brief statement of the facts relevant to the claim. The text of the grievance must be legible and presented in a courteous manner. The inmate should identify any persons who may have information which could be helpful in resolving the grievance. The inmate may also specifically state any claims he/she wishes to make concerning violations of Department directives, regulations, the ICU Consent Decree or other law. The inmate may request to be personally interviewed prior to the decision on Initial Review. Any inmate who submits a grievance containing false and malicious information may be subject to disciplinary action.

5. Grievances and appeals based on different events should be presented separately, unless it is necessary to combine the issues to support the claim. The Grievance Officer may combine multiple grievances which relate to the same subject.

NOTE: At any point in the grievance process, the inmate has the right to withdraw the grievance.

B. Initial Review

1. Initial Review Procedures must be completed before Appeal from Initial Review or Final Appeal may be sought. Any claims of violation of the ICU Consent Decree must be raised through this grievance procedure before they may be addressed by any court.

2. Grievances must be submitted for initial review to the Facility/Regional Grievance Coordinator within fifteen (15) days after the events upon which the claims are based. Extensions of this time period may be granted by the Facility Manager/Regional Director for good cause.

3. The Grievance Coordinator will forward the grievance to the appropriate Grievance Officer for investigation and resolution. The inmate grievant and other persons having personal knowledge of the subject matter may be interviewed. A grievant who has requested a personal interview, shall be interviewed.

4. Within ten (10) working days of receipt of the grievance by the Grievance Officer, the grievant shall be provided a written response to the grievance to include a brief rationale, summarizing the conclusions and any

action taken or recommended to resolve the issues raised in the grievance.

The Grievance Coordinator may authorize an extension of up to an additional ten (10) working days if the investigation of the grievance is pending. If an extension is necessary, the grievant shall be so advised in writing.

C. Appeal from Initial Review

1. An Initial Review Decision of a grievance on a Health Care or medical treatment issue may be appealed directly to the Central Office Medical Review Committee for Final Review within five (5) days of receipt by the inmate of the Initial Review decision. A grievance for which the Corrections Health Care Administrator conducted the Initial Review will usually be considered a Medical Grievance.

All other appeals will be submitted as follows:

2. An inmate may appeal an initial review decision to the Facility Manager or Community Corrections Regional Director in writing, within five (5) days from the date of receipt by the inmate of the Initial Review decision. **The inmate must appeal in this manner prior to seeking Final Review. Only issues which were raised for initial review may be appealed.**

3. All appeals must conform to the requirements specified in Section VI A of this directive. The appeal must clearly identify the decision appealed from and all reasons for appeal. Only one appeal from any initial review decision will be permitted.

4. The Facility Manager or Regional Director must notify the inmate of his/her decision within ten (10) working days after receiving the appeal. This decision may consist of approval, disapproval, modification, reversal, remand or reassignment for further fact finding, and must include a brief statement of the reasons for the decision.

D. Final Review

1. Any inmate who is dissatisfied with the disposition of an Appeal from Initial Review decision, may, within seven (7) days of receiving the decision, appeal any issue related to non-compliance with the ICU Consent Decree, other law, Department directive or policy, for final review. Only issues raised at the Initial Review and Appeal level may be referred for Final Review.

2. Final Review will not be permitted until the inmate has complied with all procedures established for Initial Review and Appeal from Initial Review. Exceptions may be made for good cause.

3. Final Review of all appeals will be sent directly to the CORC except the following:

a. Medical Grievances which will be reviewed by COMRC.

b. Requests for Final Review of appeals from disciplinary actions which were processed through DC–ADM 801. These will be reviewed by the Office of the Chief Counsel which may respond directly to the inmate or refer the appeal to the Central Office Review Committee (**CORC**) for further reviews.

The address of the **CORC/COMRC** is:

**PA DEPARTMENT OF CORRECTIONS**

**CENTRAL OFFICE REVIEW COMMITTEE**

**PO BOX 598/2520 LISBURN ROAD CAMP HILL, PA 17001–0598**

4. Requests for Final Review must clearly identify the decision appealed from and all reasons for appeal. Only one appeal from any second level (Appeal from Initial Review) decision will be permitted.

5. The CORC/COMRC or any member thereof, may require additional investigation to be made prior to a decision on a Final Review appeal.

6. The COR/COMRC will review all issues properly raised according to the

above procedures. It may also review and consider any other related matter.

7. For all Appeals receiving Final Review, the CORC/COMRC will issue its decision within twenty-one (21) days after receipt of an appeal. The decision may consist of approval, disapproval, modification, reversal, remand or reassignment for further fact finding, and must include a brief statement of the reasons for the decision. The committee shall notify the grievant and Facility Manager/Regional Director of its decision and rationale.

8. The Chief Counsel will notify counsel for the ICU class of disposition by the CORC/COMRC of any matter raised on Final Review alleging a violation of the ICU Consent Decree.

E. Exceptions

Initial Review and Appeal from Initial Review of issues related to the following Administrative Directives shall be in accordance with procedures outlined therein, and will not be reviewed by the Grievance Officer or Grievance Coordinator.

1. DC ADM 805—Policy & Procedures for Obtaining Pre–Release Transfer.

2. DC ADM 801—Inmate Disciplinary and Restricted Housing Unit Procedures. See DC–ADM 801 VI., G & I

3. DC ADM 8002—Administrative Custody Procedures. See DC–ADM 802, VI, B, 1, 2. Appeal from Initial Review, see DC–ADM 802, VI, B, 4, a.

4. DC–ADM 814—Incoming Publications

See 814–IIIB, Appeal from Initial Review, see 814–IIID.

Additionally, there may be other kinds of issues for which Initial Review Procedures have been previously established by Administrative Memorandum or Policy Statement.

F. Admissions and Review

1. All proceedings pursuant to this directive are in the nature of settlement negotiations and will, therefore, be inadmissible before any court or other tribunal in support of any claim made against the Commonwealth or any employee. No resolution of any grievance offered as a result of this procedure shall be admissible before any court or other tribunal as an admission of violation of the ICU Consent Decree or any State or federal law.

2. No decision rendered as a result of the processing of a grievance shall be reviewable by any court unless it establishes a system or institution-wide violation of the decree.

G. Completion of Review After Transfer

Any inmate who is transferred after the filing of a grievance or appeal, but prior to the completion of the appeal process, may continue to pursue the grievance or appeal by notifying the Facility Manager or Regional Director of the facility in which confined when the grievance was filed. Adjustments in the various time limitations may be made to facilitate review.

## VII. SUSPENSION DURING EMERGENCY

In an emergency situation or extended disruption of normal institutional operation, any provision or section of this policy may be suspended by the Commissioner or his/her designee for a specific period of time.

## VIII. RIGHTS UNDER THIS POLICY

This policy does not create rights in any person nor should it be interpreted or applied in such a manner as to abridge the rights of any individual. This policy should be interpreted to have sufficient flexibility so as to be consistent with law and to permit the accomplishment of the purpose of the policies of the Department of Corrections.

## IX. SUPERSEDED POLICY AND CROSS–REFERENCE

This directive revises the Inmate Grievance System (DC–ADM 804, May 1, 1984), and supersedes the pilot grievance system in effect at selected DOC institutions. It does not supersede or repeal any portion of any other directive or policy statement. Where this directive is inconsistent with any other directive or policy, both shall be

interpreted so as to provide full review of all issues raised, consistent with the scope and purpose of this directive. Conflicts will most frequently occur at the Initial Review level, where other directives establish committees to review specific issues.

Cross References: DC–ADM 801, DC–ADM 802

ACA Cross–References: 3–4271

cc: Executive Deputy Commissioner Reid
    Deputy Commissioner Clymer
    Deputy Commissioner Fulcomer
    Acting Deputy Commissioner Beard
    All Superintendents
    CCC Directors (4)
    File

    /s/ Joseph D. Lehman
        Joseph D. Lehman,
        Commissioner