**ALLIANCE TO END REPRESSION, et al., Plaintiffs,**

**and**

**Chicago CISPES, et al., Petitioners–Appellees,**

**v.**

**CITY OF CHICAGO, et al., Defendants,**

**and**

**Federal Bureau of Investigation, Respondent–Appellant.**

Nos. 96–2347, 96–4014.

United States Court of Appeals, Seventh Circuit.

Argued April 24, 1997.

Decided July 2, 1997.

Richard Gutman, Montclair, NJ, for Petitioners–Appellees.

Susan S. Sher, Office of the Corporation Counsel, Appeals Division, Chicago, IL, for Defendants.

Frank W. Hunger, Office of the United States Attorney General, William Kanter, John F. Daly, Department of Justice, Civil Division, Appellate Section, R. Joseph Sher, Department of Justice, Civil Division, Washington, DC, James B. Burns and Thomas P. Walsh, Office of the United States Attorney, Civil Division, Chicago, IL, Howard M. Shapiro, John McNamara, Larry R. Parkinson, Federal Bureau of Investigation, Washington, DC, for Respondent–Appellant.

Before EASTERBROOK, KANNE, and EVANS, Circuit Judges.

TERENCE T. EVANS, Circuit Judge.

These are consolidated appeals growing out of a petition to enforce a 1981 consent decree. In one appeal, the Federal Bureau of Investigation claims that the order enforcing the decree is based on a flawed interpretation of its language; the other appeal is from an award of attorney fees to the petitioners.

In 1974, the original plaintiffs in this case, including the Alliance to End Repression and the American Civil Liberties Union, filed a class action complaint against the City of Chicago, the Chicago Police Department, the U.S. Attorney General, and the Director of the FBI, alleging that the defendants were engaging in unconstitutional conduct directed at their First Amendment activities. After several years, the case was settled in August of 1981 by the entry of a consent decree which was approved by a district judge.[1] *Alliance to End Repression v. Chicago*, 91 F.R.D. 182 (N.D.Ill.1981).

The consent decree purported to give standing for enforcement petitions to all former named plaintiffs, any member of the plaintiff class, or any U.S. person residing in

William T. Barker, Soinnenschein, Nath & Rosenthal, Chicago, IL, for Plaintiffs.

William T. Barker, Soinnenschein, Nath & Rosenthal, Chicago, IL, Harvey M. Grossman, Roger Baldwin Foundation of ACLU, Inc., Chicago, IL, Richard Gutman, Montclair, NJ, for Plaintiff–Appellee American Civil Liberties Union.

1. The judge who signed the decree was Susan Getzendanner, who joined the United States District Court for the Northern District of Illinois in 1980, 6 years after the suit was filed. Judge Getzendanner was no longer a district judge in 1988 when this enforcement action was filed. The present appeals grow out of orders issued by Judge Ann Claire Williams.

Chicago prior to the effective date of the stipulation. That is why the current petitioners, including the Chicago Committee in Solidarity with the people of El Salvador—CISPES—claim to have standing to bring this enforcement action. CISPES falls within the plaintiff classes in the original actions; and because in the current petition it alleges injury-in-fact, we agree that the organization has standing to bring this enforcement action.

The allegation before us is that the FBI violated the consent decree during its investigation of CISPES from March 1983 through June 1985. In the suit, CISPES sought an order requiring the FBI to expunge records growing out of its investigatory surveillance. CISPES also sought an order requiring the FBI to provide additional training concerning the consent decree to its agents in Chicago. Both sides filed for summary judgment. Ultimately, the district judge found that the defendants had violated the decree. She ordered the relief requested. The FBI has appealed, concentrating on a narrow question: Was the investigation, in the words of the consent decree, in "serious intentional non-compliance" with the decree?

The record shows that in September 1981 the FBI began an investigation of CISPES to see whether it was in compliance with the provisions of the Foreign Agents Registration Act. No violations of the Act were found, although it was discovered that in its literature CISPES endorsed the objectives of two Salvadoran terrorist groups. This investigation was closed in December 1981.

Then in March 1983, the Dallas field office of the FBI received information from a Central American expatriate named Frank Varelli, which prompted a new investigation of CISPES to see whether it was offering active financial or other support to El Salvadoran terrorist groups and whether it was planning terrorist activities in the U.S. The investigation began in Washington but spread, including to Chicago, and lasted from March 1983 through June 1985. In Chicago, in addition to the investigation of CISPES itself, there were 19 spin-off investigations.

The investigation involved checks of public records, photographic and visual surveillance, undisclosed attendance by government agents at public meetings, reviews of financial, utility, and telephone records, and checks of law enforcement records. There were no court-ordered searches, telephone monitoring, nor other electronic surveillance.

The FBI filed periodic reports within the United States Department of Justice. In response to a report in March 1985, overseers at the DOJ questioned whether there was a sufficient basis to continue the investigation. In June 1985 the investigation was closed.

When William Sessions became head of the FBI in 1987 he ordered an in-depth inquiry into the CISPES investigation. He acknowledged in congressional testimony that the national investigation of CISPES was flawed. He said that informant Varelli's background and reliability, and thus the accuracy of his information, were never adequately verified by the Dallas field office of the FBI. He concluded that there was "negligence all along the line" with the way Varelli was handled, but he also maintained that there were no violations of constitutional rights committed by the FBI.

Director Sessions requested that the Attorney General approve the formation of a working group consisting of members of the FBI and of other officials within the Department of Justice but outside the FBI to make recommendations regarding the modification of existing FBI guidelines; he restricted to FBI headquarters the decision to initiate an international terrorism investigation; he refined the review process; he ordered additional training of agents in regard to First Amendment activities; and he moved all records accumulated during the CISPES investigation to the National Archives. He also disciplined certain personnel involved in the CISPES investigation. CISPES contended in this 1988 enforcement suit that the same activity which displeased Director Sessions violated the consent decree.

■ A consent decree is a form of contract, so we review a district court's interpretation of such a decree as we would its interpretation of a contract—*de novo*. Ordinarily the "scope of a consent decree must be

discerned within its four corners. . . ." *United States v. Armour & Co.*, 402 U.S. 673, 91 S.Ct. 1752, 29 L.Ed.2d 256 (1971); *Goluba v. School District of Ripon*, 45 F.3d 1035 (7th Cir.1995). In an *en banc* decision in another proceeding growing out of the decree before us, we noted that the four corners required a focus on the entire decree, not just a single provision. In interpreting the decree, we said a court can "properly disregard even unambiguous language when it is convinced that the parties meant something different from what they said." The decree must be put in a larger context. Context, we said, "is the key to understanding language." The context involves what each side gave up to arrive at a consent decree. *Alliance to End Repression v. City of Chicago, et al.*, 742 F.2d 1007 (7th Cir.1984). Put another way, a court must "look at the evil which the decree was designed to rectify." *Armour & Co.*, at 682; see also *Goluba.*

█ First, looking to the four corners of the document, we see, in paragraph 3.4, that the parties agreed that three general principles apply to FBI investigations of domestic groups. These are:

(a) The FBI, in conducting domestic security investigations and inquiries, shall be concerned only with conduct and only such conduct as is forbidden by a criminal law of the United States, or by a state criminal law when authorized by federal statute. The FBI shall not conduct an investigation solely on the basis of activities protected by the First Amendment of the Constitution of the United States, or on the lawful exercise of any right secured by the Constitution or laws of the United States.

(b) The FBI, in investigating United States persons, shall not employ any technique designed to impair their lawful and constitutionally protected political conduct or to defame the character or reputation of a United States person.

(c) The FBI shall conduct its investigations with minimal intrusion consistent with the need to collect information or evidence in a timely and effective manner, and shall conduct investigations in a manner reasonably designed to minimize unnecessary collection and recording of information about the lawful exercise of First Amendment rights.

The procedures to enforce the decree are in paragraphs 5.1 and 5.2. Paragraph 5.1 provides that if the court finds that there are "reasonable grounds to believe that a violation of the terms of the Stipulation has occurred . . . the Court shall permit petitioners to conduct . . . discovery . . . and shall thereafter hold a hearing to determine the factual and legal issues raised by the petition." Paragraph 5.2 provides that the court shall make an order designed to ensure future compliance if it "finds . . . a pattern of substantial non-compliance or a serious intentional non-compliance" with the decree.

Our concern here is with the meaning of the words "intentional non-compliance." That the noncompliance is "serious" is not at issue, and our discussion assumes that seriousness exists. The word which seems to cause the trouble is *intentional.* The district court found that

because the FBI signed the Consent Decree with full knowledge of its terms, and because the investigation at issue was undertaken deliberately, the FBI's actions were intentional. Therefore . . . the FBI had engaged in "serious intentional non-compliance" with the Consent Decree.

What alarms the FBI about this conclusion is that it can be read too broadly. All FBI investigations are done deliberately. Therefore, any investigation which violates the decree can be "intentional noncompliance." Under this reading, FBI agents could feel in danger of being held responsible under what amounts to a negligence standard. The petitioners take slightly differing approaches to the language. CISPES acknowledges that negligence is not a sufficient basis for remedial action for "serious intentional non-compliance" with the decree. But it maintains, however, that the district court's interpretation would permit an enforcement order whenever there has been a substantial violation caused by more than just negligence. Therefore, it sees nothing wrong with the district court's interpretation. According to the ACLU, civil remedies normally do not require any special showing of intent. Here, that intent is required is seen as a compro-

mise to permit civil enforcement without subjecting the FBI to court orders based on minor or technical violations.

As we see it, the issue involves defining exactly what it is that must be intentional. To us that comes down to a basic question of what is modified by the adjective *intentional.* The parties discuss whether an intentional violation of the decree means that the FBI can or cannot plead ignorance of the decree and therefore argue that the violation is not intentional. If an agent did not know about that decree, how could she intentionally violate it? Such a discussion is off the mark. As the FBI plainly acknowledges, neither it nor an individual agent can defend a claim by pleading ignorance of the decree. On the other hand, neither can the FBI or its agents be held accountable during deliberately conducted investigations by negligent violations of the decree, as if *intentional* somehow modified *investigations.* This latter interpretation is that of the district court: the investigation was undertaken deliberately; therefore the FBI engaged in intentional noncompliance with the decree. We disagree with that interpretation.

In the decree, *intentional* does not modify investigation. Paragraph 5.2 provides for remedies for "serious intentional non-compliance" with the decree. *Intentional* modifies *noncompliance.* What is noncompliance? *Noncompliance* means that the FBI took one of the actions forbidden in paragraph 3.4. In this case, the action alleged was to "conduct an investigation solely on the basis of activities protected by the First Amendment." To conduct such an investigation solely on that basis would be "noncompliance." To conduct such activity with the intention of investigating purely First Amendment activities would be a basis for the entry of a court order under paragraph 5.2 of the decree.

Conversely, to conduct an investigation for the purpose of routing out terrorist activity only to find out that the basis for thinking that the organization engaged in terrorism was flimsy or nonexistent, and thus to have— during the course of a deliberate, intentional investigation-inadvertently violated the First Amendment rights of citizens, is to have been in noncompliance with the decree. But, the

noncompliance would be negligent, not intentional. To meet the requirements of paragraph 5.2 under the "serious intentional noncompliance" prong, the FBI must conduct an investigation with the intent to interfere with First Amendment rights. This is not a new reading of the decree. It is the distinction made over 12 years ago by our *en banc* panel:

> Thus it [the FBI] may not investigate a group solely because the group advocates Puerto Rican independence, a cause that most of the men and women of the FBI no doubt have little fondness for; but it may investigate any group that advocates the commission, even if not immediately, of terrorist acts in violation of federal law. It need not wait till the bombs begin to go off, or even till the bomb factory is found.

742 F.2d at 1015.

To those who might think the decree, as we interpret it, means nothing, we say they have a short memory. When this case was filed in 1974, the possibility that an investigation aimed exclusively at First Amendment activity would be launched was not at all remote. The plaintiffs in this case originally alleged that the Chicago field office conducted "domestic security" investigations with the intent to harass and intimidate various groups and individuals for expressing their political views. From 1948 to 1966 the FBI is said to have committed numerous "black bag jobs" (breakings and enterings) in the Chicago area, many of which resulted in the gathering of information concerning lawful political activities. To repeat an example from our *en banc* decision: After Martin Luther King was "named 'Man of the Year' by Time magazine, the FBI decided to 'take him off his pedestal'. . . ." If, indeed, that sort of investigative activity seems a lot less likely today, then this consent decree as well as other guidelines issued to and by the FBI have done their job. The existence of the decree today, as we have interpreted it, remains an effective deterrent to returning to a time when it had more meaning.

That the times may be different now does not mean that the phrase "intentional noncompliance" should be expanded and strengthened to prevent, not just intentional,

but negligent noncompliance. Put conversely, the FBI should not be penalized if it is, in fact, better than it was. Furthermore, as we also noted in our *en banc* decision, the decree "restricts the executive branch of the federal government in the performance of its constitutional responsibilities." To interpret the decree so that it expands the intrusion into the operations of the FBI is unwarranted.

■ On a more mundane note, our interpretation also gives meaning to the other road by which remedies can be justified: for "a pattern of substantial non-compliance." If the FBI engages in a pattern of noncompliance, an order can be issued whether or not the pattern has intentionally or negligently occurred. We think two roads to a remedy exist for a reason, and the second should not be rendered superfluous by watering down the first.

Our interpretation of the phrase "intentional non-compliance" requires that we reverse the judgment and send this case back to the district court for an analysis of the CISPES investigation under the standard we have enunciated. If, upon remand, violations of the decree are found under the standard we have just set out, the district court will need to revisit the issue of what relief is appropriate, an issue we do not reach at this time.

That said, we must also extend our regret that we must remand such an old petition. At oral argument we questioned why the FBI cares whether the relief ordered in this case is granted or not. Our impression was that the FBI's concern was not primarily with the particular order in this specific case, but rather with an overly broad reading of the language we have been discussing, a reading with potentially far-reaching effects. Given that the possibility of a broad reading has been made less likely by our decision today, it seems to us that a settlement should be reached before more resources are expended in this hoary proceeding.

■ Which brings us to the final point. A second appeal in this case involves the FBI's challenge to the award of attorney fees to the petitioners under 28 U.S.C. § 2412(b). At this point in the litigation the petitioners are

no longer prevailing parties; accordingly, the fee award is VACATED. The judgment is REVERSED and the case REMANDED for further proceedings. No costs are awarded.